877 P.2d 905

**STATE of Idaho, Plaintiff–Respondent,**

**v.**

**Roger Dale BABB, Defendant–Appellant.**

**No. 20207.**

Supreme Court of Idaho,
Moscow, April 1994 Term.

July 8, 1994.

Allen V. Bowles, Moscow, for appellant.

Larry EchoHawk, Atty. Gen., Douglas A. Werth, Deputy Atty. Gen., argued, Boise, for respondent.

JOHNSON, Justice.

This is a criminal case in which the defendant was convicted of first-degree murder and sentenced to life imprisonment with a fixed term of twenty years. The following are the issues presented and our disposition of them:

1. Whether the trial court incorrectly denied the defendant access to inspect the alleged crime scene.

 We conclude the trial court correctly denied the inspection because the defendant did not bring before the court the person who had possession and control of the crime scene.

2. Whether the trial court abused its discretion in allowing lay witnesses to testify they had not observed anything about the victim that led them to believe that he was contemplating suicide.

 We conclude that the defendant did not preserve this issue for appeal.

3. Whether the trial court abused its discretion in not reopening the defendant's pretrial suppression request during trial.

 We conclude the trial court ruled correctly.

4. Whether the trial court should have instructed the jury that the state had the burden of proving that the victim did not commit suicide.

 We conclude that the instructions correctly placed the burden on the state to prove the murder beyond a reasonable doubt.

5. Whether the prosecuting attorney was guilty of misconduct calculated to inflame the minds of jurors and to arouse prejudice and passion against the defendant.

 We conclude the defendant has not shown this to be true.

6. Whether the trial court made a disparaging remark about defense counsel that affected the jury in a manner prejudicial to the rights of the defendant.

 We conclude the trial court did not do so.

7. Whether there is substantial evidence to support the jury's verdict that the defendant killed the victim with malice aforethought and with premeditation.

 We conclude there is substantial evidence to support the verdict.

8. Whether a life sentence, with a fixed term of twenty years, is unreasonable.

 We conclude that the sentence is not unreasonable.

## I.

## THE BACKGROUND AND PRIOR PROCEEDINGS.

On March 8, 1991, Roger Dale Babb and his common law wife, Kathy Spencer, spent the evening drinking at two bars in Potlatch, Idaho, where they met Ron Boone. Boone bought Babb and Spencer a drink and in Babb's presence told Spencer she had a beautiful body. The bartender later testified that when Boone said this, Babb looked like his eyes started to snap. A witness later testified that Spencer told the witness that Boone made sexual advances toward her and wanted to go to bed with her.

Late in the evening, Boone invited Spencer and Babb to his residence where he furnished them with more alcohol. Babb fell asleep and spent the night in Boone's residence. Spencer called Babb's half brother from Boone's residence at about 4:45 a.m., sounding scared and crying.

Later in the morning, following a call from Babb, sheriff's officers arrived at Boone's residence and found Boone in his bed, with a 0.22 caliber pistol beside him and a fatal gunshot wound through his right temple. The state charged both Babb and Spencer with first-degree murder. Spencer's case is not part of this appeal.

Following the state's investigation into Boone's death, the state surrendered possession and control of Boone's residence to Boone's father. Later, Babb requested the trial court to allow defense counsel and investigators to inspect Boone's residence, alleging that Boone's father had denied permission for an inspection. The state admitted the importance to the defense of inspecting the residence, but argued that the state was not in custody or control of the premises and

that the state could not force Boone's father to admit Babb's investigators to the residence. The trial court denied Babb's request.

Prior to trial, Babb also requested the trial court to preclude the state from attempting to elicit testimony from lay witnesses regarding whether Boone "would have committed suicide" or whether Boone "was in such a mood on March 8, 1991 or March 9, 1991 as to have committed suicide." The trial court granted this request, but ruled that if the state laid an adequate foundation pursuant to I.R.E. 701, the trial court would "permit the State and each of the Defendants in these cases to inquire of lay witnesses as to whether or not there was anything they observed in the conduct of Mr. Boone which led them to believe that he was contemplating suicide."

In its case-in-chief at trial, the defense presented testimony of witnesses who said Boone had talked of suicide and had acted peculiarly prior to his death. The defense did not specifically ask witnesses about suicide, Boone's predisposition toward suicide, or whether Boone had acted in a manner which made the witnesses believe Boone was contemplating suicide.

The state presented rebuttal evidence through numerous witnesses who testified that there was nothing they observed about Boone that led them to believe he was contemplating suicide. Babb did not object to these questions.

Prior to trial, Babb made a discovery request for "[a]ny relevant written or recorded statements made by [Babb], or copies thereof, within the possession, custody or control of the State ... the existence of which is known or is available to the Prosecuting Attorney or his agents by the exercise of due diligence."

Babb also requested that the trial court suppress the statement made by him to a law enforcement officer who administered a polygraph examination to Babb. Babb contended that the officer questioned Babb at a time when he knew Babb was represented by counsel in violation of his sixth amendment rights.

The trial court denied Babb's request to suppress Babb's statements during the polygraph examination interview. The trial court stated that Babb had not shown that his statements were involuntary because he did not understand his rights or the consequences of his waiver of rights.

During the trial, the state called the officer to testify to the statements Babb made during the polygraph examination interview. Toward the end of the officer's direct examination, Babb informed defense counsel that he believed the interview with the officer had been recorded. On cross-examination, the officer admitted that the interview with Babb had been tape recorded. The prosecution had not produced the tape recording prior to trial pursuant to Babb's discovery request. During a recess, the prosecutor informed the trial court that he had only learned that morning of the existence of the tape recording.

The following morning, defense counsel requested that the trial court allow Babb to reopen the request to suppress the statements Babb made in the interview with the officer, based on the state's failure to reveal the tape recording. The defense argued that the tape recording revealed that Babb's statements during the interview were not made knowingly, voluntarily, and intelligently.

The trial court found that the prosecuting attorney had not exercised due diligence in determining whether there was a tape recording of the polygraph examination interview with Babb, and that the state had failed to comply properly with Babb's discovery request. The trial court then considered whether this was sufficient to reopen Babb's request to suppress the statements. The trial court ruled that the request could be reopened if Babb discovered additional facts after the trial court denied the suppression before trial, and with reasonable diligence, Babb could not have discovered these facts earlier. In denying Babb's motion to reopen, the trial court decided that because Babb had been present at the interview, exercising due diligence, the defense would have known about the tape recording before trial.

938

At the conclusion of the trial, Babb proposed a jury instruction, which stated: "The defense has presented evidence that Ron Boone may have committed suicide. The defense has no burden to prove suicide. The state has the burden to prove beyond a reasonable doubt that Ron Boone did not commit suicide." The trial court refused to give the instruction, concluding that the instruction misstated the law because the state's burden was to prove beyond a reasonable doubt that Babb shot Boone, not to prove beyond a reasonable doubt that Boone did not commit suicide. Instead, the trial court informed defense counsel that he should argue in the defense's closing argument. reasonable doubt based on the possible suicide.

The jury found Babb guilty of first-degree murder. The state sought the death penalty, but the trial court sentenced Babb to life imprisonment, with a minimum fixed term of twenty years.

Babb appealed.

## II.

## THE TRIAL COURT CORRECTLY DENIED BABB'S MOTION TO INSPECT BOONE'S RESIDENCE.

Babb asserts that the trial court improperly denied access to inspect Boone's residence. We disagree.

■ Babb's motion requested an order allowing defense counsel and his agents to inspect Boone's residence, and to be accompanied by a deputy sheriff, "to assure that said inspection is not interfered with or subject to any supervision by any party who may now have a possessory interest in said premises or anyone residing in said residence as a caretaker." The motion stated that it was based on these facts: (1) the inspection was essential to the preparation of the defense; (2) defense counsel had previously contacted Boone's father, who had denied permission for inspection of Boone's residence; and (3) defense counsel believed that if a deputy sheriff was not ordered to accompany defense counsel and the defense investigator to the residence, "said inspection will be denied and/or frustrated by interference."

In denying this motion, the trial court stated:

THE COURT: Well, [defense counsel], I—I empathize with your client's position. I agree that he should have the opportunity or someone who is acting attorney have the opportunity to inspect those premises but I don't think I have the power to order such an inspection unless it's been demonstrated to me that those premises are now in the possession, custody or under control of the Prosecuting Attorney.

In fact I've mulled over in my mind whether—whether or not—whether or not I would have authority to order the person in possession or owner of those premises to appear before me and show cause why you should not be allowed to enter the premises. I just don't have any authority for that. I'd be—I want to see you have the opportunity to inspect the premises. Let's say I think it's appropriate, but I don't think I can order it unless there's a showing of possession, custody or under control of the Prosecuting Attorney.

[Defense counsel]: I would certainly think under the Defendant's constitutional right to prepare a defense that he would have a right to inspect the premises of where some alleged crime took place.

THE COURT: Well, that's fine. You argue that. Bring the—seek an Order to Show Cause from me directing the owner to appear and show cause why he should not be required to make those premises available because I don't find any law on it.

[Defense counsel]: Okay.

THE COURT: So the Defendant's motion for order allowing defense counsel to inspect the scene where Mr. Boone met his death is denied at this time, subject to being renewed on any other basis.

Babb argues that the trial court had authority to order the inspection of the residence pursuant to art. 5, § 2 of the Idaho Constitution, I.C. §§ 1–1603 and 1–1622, and I.C.R. 16(b)(8). Babb also argues that the trial court had inherent power to order inspection of Boone's residence, citing *State v. Coburn*, 82 Idaho 437, 354 P.2d 751 (1960).

Art. 5, § 2 of our constitution vests in the courts the judicial power of the state. I.C. § 1–1603 states that every court has power to compel obedience to its orders. I.C. § 1–1622 confers on a court all means necessary to exercise its jurisdiction. I.C.R. 16(b)(8) states:

> Disclosure by order of the court. Upon motion of the defendant showing substantial need in the preparation of the defendant's case for additional material or information not otherwise covered by this Rule 16(b), and that the defendant is unable without undue hardship to obtain the substantial equivalent by other means, the court in its discretion may order the additional material or information to be made available to the defendant. The court may, upon the request of any person affected by the order, vacate or modify the order if compliance would be unreasonable or oppressive.

In *Coburn,* the defendant was convicted of negligent homicide for running his vehicle into the back of the victims' vehicle, knocking the victims off the road and causing their deaths. The defendant challenged the trial court's permitting the jury to leave the court to view the damaged automobile in which the victims rode. *Id.* at 445, 354 P.2d at 755. While there was a statute expressly permitting the jury to view the premises where an event occurred, there was no other explicit authority permitting the jury to leave the courtroom to view evidence. The Court ruled that it was proper to allow the jury to view the damaged automobile outside the courtroom, appearing to conclude that permitting the jury to do so is within the inherent power of the trial court. *Id.* at 446, 354 P.2d at 756.

The question presented by Babb's motion is not whether the trial court had judicial authority; it is not whether the trial court had the power or means to enforce its orders; it is not whether the trial court had the power to require the prosecution to disclose evidence and materials upon the defendant's request; nor is it a question of the inherent power of the trial court. The question is whether Babb's motion, which was served only on the prosecuting attorney, and not on Boone's father, provided a sufficient basis for the trial court to order an inspection of Boone's residence by Babb's attorney and investigators, when the residence was not within the possession or control of the prosecution. Neither the provisions of the constitution, the statutes, or the criminal rules Babb cites, nor *Coburn,* direct the answer to this question that Babb seeks.

The constitutional and statutory provisions Babb cites merely give the trial court judicial authority and the power to compel obedience to its orders and power to exercise its jurisdiction. This begs the question presented here: Could the trial court order a party not before the court to allow inspection of the residence?

We do not read I.C.R. 16(b)(8) to authorize the trial court to order the prosecuting attorney to allow an inspection of real property in the possession or control of someone other than the prosecution when that person has not been brought before the court. The last sentence of I.C.R. 16(b)(8) ("The court may, upon the request of any person affected by the order, vacate or modify the order if compliance would be unreasonable or oppressive.") does not indicate to us that an order for disclosure pursuant to I.C.R. 16(b)(8) may command disclosure by someone who is not before the trial court.

*Coburn* is distinguishable from Babb's assertion in this case, because the question presented in *Coburn* was whether the trial court had the authority to permit the jury to leave the courtroom to view the automobile, not whether the trial court had the authority to require a third party in possession of the automobile to allow the view.

Babb did not follow up on the trial court's invitation to request an order to show cause bringing Boone's father, who was in possession of the residence, into court and requiring Boone's father to show cause why he should not be compelled to allow the defense to inspect the residence. Babb contends that the trial court's comments in denying the request clearly show that requesting an order to show cause would have been futile.

We conclude that Babb has missed the significance of the trial court's invitation for

Babb to request an order to show cause. Since Babb sought an order allowing inspection of Boone's residence, it was critical that Babb bring Boone's father before the trial court, giving Boone's father notice and an opportunity to respond before the trial court issued an order compelling action by Boone's father.

We also note that after the trial court denied Babb's motion to inspect the Boone residence, Boone's father offered Babb's attorney the opportunity to inspect the first floor of Boone's residence, where Boone was shot, in the presence of a deputy sheriff. Babb's attorney declined this opportunity because Boone's father would not permit an investigator to accompany Babb's attorney. While this was not the full opportunity for an inspection Babb sought by his request to the trial court, it was an opportunity that might have provided information Babb's attorney thought necessary to Babb's defense.

We are also influenced by Babb's failure to pursue an inspection of Boone's residence during the trial after a question arose about the location of a telephone that Babb testified he had used to call the sheriff's office. This seems to be the most pertinent information Babb contends he needed during the trial that he could have obtained through an inspection.

## III.

## BABB DID NOT PRESERVE FOR APPEAL HIS OBJECTION TO THE LAY WITNESS TESTIMONY, AND THE ERROR, IF ANY, WAS NOT FUNDAMENTAL.

Babb asserts that the trial court should not have permitted testimony by lay witnesses concerning conduct they had observed indicating whether Boone was contemplating suicide. We do not address this issue because Babb's request in limine to preclude this testimony did not encompass this objection, Babb did not object to the testimony at trial, and the error, if any, in allowing the testimony was not fundamental.

■ Denial of a motion in limine preserves for appeal the objection to evidence raised in the motion. Where the motion did not cover the basis of objection raised on appeal, however, and where there was no objection to the evidence when it was offered at trial, the admission of the evidence may not be challenged on appeal, unless it was fundamental error. *State v. Higgins,* 122 Idaho 590, 596, 836 P.2d 536, 542 (1992).

■ Babb's request in limine to preclude the testimony of the lay witnesses referred only to testimony concerning whether Babb would commit suicide or was in a mood to commit suicide. Babb did not object to the evidence presented through the lay witnesses at trial about which he now complains. Therefore, we must consider if any error in allowing the testimony was fundamental error. Otherwise, we should not address the issue.

■ The Court has defined fundamental error to be error that: (1) goes to the foundation or basis of a defendant's rights, (2) goes to the foundation of the case, or (3) takes from the defendant a right which was essential to the defendant's defense which no court could or ought to permit the defendant to waive. *State v. Knowlton,* 123 Idaho 916, 918, 854 P.2d 259, 261 (1993).

In *State v. Bingham,* 116 Idaho 415, 776 P.2d 424 (1989) (overruled on other grounds by *State v. Pizzuto,* 119 Idaho 742, 775, 810 P.2d 680, 713 (1991)), the Court ruled: "An abuse of discretion in admitting evidence is a trial error and does not go to the foundation of the case or take from the defendant a right which was essential to [the defendant's] defense." *Bingham,* 116 Idaho at 423, 776 P.2d at 432.

■ The Court has recently reiterated that the determination of a trial court whether to admit expert opinion testimony pursuant to I.R.E. 702 is within the discretion of the trial court. *State v. Raudebaugh,* 124 Idaho 758, 763, 864 P.2d 596, 601 (1993). The Court has indicated that admission of lay opinion testimony pursuant to I.R.E. 701 is likewise within the discretion of the trial court. *State v. Missamore,* 119 Idaho 27, 32, 803 P.2d 528, 533 (1990).

■ Therefore, we conclude that, if the trial court erred in admitting lay witness opinion, it was not fundamental error, and we will not address the issue.

## IV.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY REFUSING, DURING TRIAL, TO REOPEN BABB'S PRETRIAL SUPPRESSION MOTION.

■ Babb asserts that the trial court abused its discretion in refusing to reopen, during trial, Babb's pretrial suppression motion based on the failure of the state to reveal the tape recording of the polygraph examination interview. We disagree.

The portion of the tape recording cited by Babb in support of his motion to reopen states:

> [First officer]: Okay Roger—gonna basically go through the whole thing again.
>
> Babb: I'm here to take a polygraph test—period.
>
> [First officer]: Well, part of the test procedure is the interview prior to the test—so ...
>
> Babb: If you guys have some direct questions you want to ask, because I'm not going to go through that story again. I told you, I don't know how many times that day, and I also drawed those diagrams for you.
>
> [Second officer]: Yeah, but he's the one doing the polygraph.
>
> [pause]
>
> Babb: What do you want me to tell. Is this from the beginning of the evening of the night before or what I found when I woke up in the morning or what?
>
> [First officer]: 'Kay. I want you to start—say on noon Friday—
>
> Babb: Okay.
>
> [First officer]: Tell me what you did step by step no matter how minute it is and what you remembered.
>
> Babb: All right.

Babb then began to recount his story. This did not contradict the testimony of the officer at the suppression hearing. Also, as the trial court pointed out in denying the motion to reopen, what transpired at the interview was available to Babb because he was present and participated in the portion of the interview that is the basis for the motion to reopen. Applying the three-step inquiry the Court adopted in *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989), we conclude that the trial court did not abuse its discretion in denying Babb's motion to reopen.

## V.

### THE TRIAL COURT CORRECTLY RE-JECTED THE DEFENDANT'S PRO-POSED JURY INSTRUCTION CON-CERNING THE STATE'S BURDEN TO DISPROVE THAT BOONE COM-MITTED SUICIDE.

■ Babb asserts that the trial court's refusal to instruct the jury concerning the burden of proof as to whether Boone committed suicide denied Babb a fair trial. We disagree.

In *State v. Eastman,* 122 Idaho 87, 831 P.2d 555 (1992), the Court stated:

> [J]ury instructions are read as a whole to insure that they fully and fairly represent the applicable law. A defendant's requested instruction need not be given if it was either an erroneous statement of the law, adequately covered by other instructions, or not supported by the facts of the case.

*Id.* at 89, 831 P.2d at 557 (citations omitted).

■ We agree with the trial court that the state was required only to prove that Babb took the life of Boone, and did not have the burden to prove that Boone did not commit suicide. The purpose of Babb's proposed instruction was covered by other instructions given by the trial court. The trial court instructed the jury that the defendant is presumed innocent, that the state has the burden of proving each and every material element of the offense beyond a reasonable doubt, that the burden of proof is always upon the state, and that the defendant is not required to prove his innocence in any way. This instruction adequately informed the

jury that Babb was not required to prove that Boone committed suicide.

## VI.

### THERE IS NO SHOWING THAT ANY STATEMENTS OF THE PROSECUTOR WERE MADE TO INFLAME THE JURY OR TO AROUSE PREJUDICE AND PASSION AGAINST BABB.

■ Babb asserts that the prosecuting attorney was guilty of misconduct calculated to inflame the minds of the jurors and to arouse prejudice and passion against Babb. We disagree.

Babb presents a litany of statements by the prosecutor which he argues by themselves and taken cumulatively represent prosecutorial misconduct sufficient to reverse his conviction.

In *State v. Givens*, 28 Idaho 253, 268, 152 P. 1054, 1058 (1915), the Court stated:

It is the duty of the prosecutor to see that a defendant has a fair trial, and [the prosecutor] should never seek by innuendo or inference to pervert the testimony, or make statements to the jury which, whether true or not, have not been proved. The desire for success should never induce [the prosecutor] to obtain a verdict by argument based upon anything except the evidence in the case and the conclusions legitimately deducible from the law applicable to the same.

The Court has also said: "[T]he prosecutor is normally given considerable latitude in his [closing] argument. He has the right to discuss the evidence and the inferences and the deductions arising therefrom." *State v. LaMere*, 103 Idaho 839, 844, 655 P.2d 46, 51 (1982).

Although Babb did not object to the statements he now challenges, if the misconduct of the prosecutor was calculated to inflame the minds of jurors and arouse passion or prejudice against the defendant, or is so inflammatory that the jurors may be influenced to determine guilt on factors outside the evidence, no waiver by failure to object or other means will be implied. *Id.* Having

reviewed all of the statements that are the basis for Babb's assertion of prosecutorial misconduct, we conclude that none of them indicate an intent on the part of the prosecuting attorney to inflame the minds of the jurors or to arouse passion or prejudice against Babb, nor were they so inflammatory that the jurors might be influenced to determine guilt on factors outside the evidence.

## VII.

### THE TRIAL COURT'S REMARK ABOUT DEFENSE COUNSEL IN THE PRESENCE OF THE JURY CANNOT REASONABLY BE CONSTRUED AS DISPARAGING.

■ Babb asserts that the trial judge made a disparaging remark about defense counsel in the presence of the jury, and that this denied Babb his right to a fair trial. We disagree.

The alleged prejudicial comment occurred during defense counsel's redirect examination of the pathologist who performed the autopsy on Boone. During this testimony, in illustrating the path of the bullet through Boone's head, the pathologist mistakenly referred to defense counsel's head, instead of Boone's head. The trial judge then stated:

THE COURT: We—you made reference several times to [defense counsel's] head and—

THE WITNESS: I apologize.

THE COURT: There may be some of us who have some questions about [defense counsel's] head.

THE WITNESS: I apologize.

THE COURT: You meant Mr. Boone's.

THE WITNESS: I definitely meant Mr. Boone.

THE COURT: Okay. Fine. Counsel.

[Defense counsel]: Okay.

Babb asserts that the statement, "There may be some of us who have some questions about [defense counsel's] head," disparaged defense counsel, and denied Babb of his right to a fair trial.

We agree with defense counsel that remarks by a trial judge conveying personal

prejudices or disparaging the defendant or defendant's counsel are of the utmost gravity. *See State v. Linebarger*, 71 Idaho 255, 260–61, 232 P.2d 669, 673 (1951). However, we do not construe the trial judge's remark as intended to disparage defense counsel or as being likely received by the jury as disparaging defense counsel. The statement was an acknowledgment by the trial judge that the witness's mistaken reference to defense counsel may have been confusing to the jurors. We also note that, at the time of the statement, defense counsel neither objected to the statement nor made a request for a discussion outside the presence of the jury regarding the statement.

## VIII.

**THERE IS SUBSTANTIAL EVIDENCE TO PROVE BEYOND A REASONABLE DOUBT THAT THE DECEASED DIED AS A RESULT OF A HOMICIDE COMMITTED BY BABB, RATHER THAN AS A RESULT OF SUICIDE, AND THAT THE HOMICIDE WAS COMMITTED WITH MALICE AFORETHOUGHT AND PREMEDITATION.**

 Babb asserts that the state did not produce sufficient evidence to allow reasonable jurors to find beyond a reasonable doubt that Boone's death was the result of homicide rather than suicide, and that the homicide was committed with malice aforethought and premeditation. We disagree.

In *State v. Erwin*, 98 Idaho 736, 572 P.2d 170 (1977), the Court stated:

[I]t becomes our obligation to consider and determine whether the verdict is supported by the evidence.

In making our review we are required to give full consideration to the right of the jury to determine the credibility of witnesses, the weight to be afforded evidence, as well as the right to draw all justifiable inferences from the evidence before them. But, at the same time, judicial review requires that we peruse that evidence to determine whether a reasonable mind would conclude that the defendant's guilt as to each material element of the offense

was proven beyond a reasonable doubt. Here our concern is with the element of felonious intent, and if the evidence is such that reasonable jurors must necessarily have a reasonable doubt as to the proof of that element, we can not allow the verdict to stand. This has come to be known as the "substantial evidence rule"....

*Id.* at 740, 572 P.2d at 174.

We will uphold a jury verdict if "there was substantial evidence from which a rational trier of the facts could have found beyond a reasonable doubt that" the state proved the elements of the crime. *State v. Filson*, 101 Idaho 381, 386, 613 P.2d 938, 943 (1980).

Babb asks this Court to look at the evidence Babb introduced suggesting Boone committed suicide. Our task in determining whether there is substantial evidence to support the jury verdict, however, requires us to look at all the evidence supporting Babb's guilt, taking all inferences in favor of the state, to determine whether there is substantial evidence to support a verdict of guilty beyond a reasonable doubt.

In presenting its case, the state relied primarily on the physical evidence, inconsistencies in Babb's statements, Babb's acknowledged lies, testimony inconsistent with Babb's version of the facts, and testimony suggesting that Boone did not commit suicide.

Evidence of the following was introduced at trial: Boone, Babb, and Spencer met at one of the bars in Potlatch on the night of March 8, 1991. In the early morning hours of March 9, 1991, at approximately 1:30 or 2:00 a.m., Babb and Spencer accompanied Boone back to Boone's house. Babb was physically present in the house at the time of Boone's death. Boone was shot in his bed with a 0.22 caliber pistol that was held one to six inches from his right temple, with a most likely distance of three inches. The physical evidence showed no signs of a struggle. Babb admitted being in the bedroom, handling the gun, and wiping all fingerprints from the gun.

Babb made statements prior to trial and testified at trial. Some of Babb's statements appeared to be inconsistent with the physical

evidence and other testimony. Babb had stated that he believed Boone was dead when he left Boone's house. Babb stated that when he saw Boone, Boone did not appear to be breathing or moving. Babb also stated that, when he first woke up, he heard a loud noise that sounded like snoring, and he followed it toward Boone's bedroom to find out what it was. He said he could not locate the sound of the noise. When the sheriff's officers arrived, however, they found Boone alive and emitting a loud, gasping, rasping, gurgling noise, and bubbles of blood were escaping his nose and mouth.

In addition, when Babb was first questioned by the sheriff's officers, he lied about having touched the gun. Babb originally stated that he never touched the gun. He later recanted and admitted that he did touch it and subsequently wiped his fingerprints from it.

Babb testified that he found Boone in Boone's bedroom lying on his back, in the position discovered by the sheriff's officers. The state presented the testimony of Babb's landlord that Babb had told her that he only noticed Boone's bullet wound after he rolled Boone over.

Babb testified that he awoke on March 9, 1991, found Boone, and eventually left the house for the first time when he walked down to the road and hitchhiked a ride into Potlatch. Babb testified that, at this time, he had been frantically attempting to find Spencer, but that he was unable to locate her. According to Babb's version of the events, he did not see or talk to Spencer until almost 11:00 a.m., when he and his half brother met her at a residence near the ditch into which Spencer had driven her car.

The person who gave Babb a ride that morning testified that he picked Babb up right at 10:00 a.m. He also testified that Babb had explained to him why he was hitchhiking: "He told me that he'd been out drinking the night before. And that he—well, he and his girlfriend. And that he got the car stuck on a dirt road by an old house, and then in the night he passed out and when he woke up she was gone." Babb then pointed obliquely backwards, in the direction of both Boone's residence and the residence

where Spencer went after her vehicle was stuck in a ditch, which was not far from Boone's residence.

Spencer had driven her vehicle into a ditch near a residence. The person who removed the vehicle from the ditch testified that the ditch was very small, that there were no skidmarks where the car had entered the ditch, that the vehicle had not hit the opposite bank of the ditch, and that only the left front tire was in the ditch. Babb testified to having absolutely no contact with Spencer prior to seeing Spencer at the residence where she went after driving into the ditch, and that he did not know what happened to her. Therefore, at the time Babb told the person who gave him a ride that he had gotten his car "stuck on a dirt road," if he was referring to Spencer's vehicle, he could not have known that Spencer had stuck the vehicle in the ditch, unless the two had planned their stories.

There was also testimony that Babb had, prior to being picked up while hitchhiking, driven a brown vehicle into Potlatch. A neighbor of Babb's testified that she saw the vehicle pull into Babb's driveway at about 9:30 a.m. The neighbor testified that she did not see anybody get out and did not know who was driving the vehicle. Another neighbor of Babb testified at trial that she saw Babb driving the brown vehicle between 9:30 and 10:00 a.m. out of Potlatch in the general direction of Boone's house. Babb's testimony indicated that he did not leave Boone's house for the first time until 10:00 a.m.

The state also presented as evidence of Babb's guilt Babb's delay in calling the sheriff's office to report Boone's death. Babb called his home from Boone's home at 9:45 a.m., after he claimed to have discovered Boone's body. However he did not call the sheriff's office until 10:55 a.m., from the residence where Spencer went after her vehicle became stuck in the ditch.

In addition, the state introduced statements made by Babb consistent with guilt. A witness testified that, when Babb arrived at the residence where Spencer went after her vehicle became stuck in the ditch, he told

Spencer, "Kathy, I'm sorry I got you into this." This witness also testified:

> [T]hey had come in to use the phone to call—to report the shooting. And so— Kathy [Spencer] was asking—it was kind of like—the way they presented it to me to kind of explain, I guess, what was going on was Kathy kind of asked a series of questions to Roger [Babb], and the three of us were kind of standing in a huddle, kind of, and [Babb's half brother] was over—he was over on another part of the room with the kids, and the three of us were standing together.
>
> And so she said—she asked him if he was sure that Ron Boone was dead and he said—he said, Yes. Yes, he was sure. And she said, Well, how can you tell? And he said, Well, you can just tell. And she said, Well, did you take his pulse? And he said, No. And Kathy said, Could you have killed him? And he said—Well, Kathy, of course I could have done it but I didn't.

Babb later made a similar statement to sheriff's officers. One of these officers testified to the following discussion with Babb:

> I said, Roger, is it possible that you could have shot him? Because it came up—the point that he says he has blackouts and doesn't remember a lot of things. I said, Roger, if you don't remember a lot of things when you've been drinking a lot and you have these blackouts, is it possible that you could have shot Mr. Boone? And he said—at first he was saying, No, you know. No, I don't think so, you know.
>
> And then as the time progressed throughout the interview I would ask him again, I would say, Well, Roger, is it possible you could have shot him? And he said, Well—I guess it's possible but, I mean, I just wouldn't do something like that. I wouldn't shoot somebody.
>
> Until one of my last times I asked him, I said, Roger, is it possible—again I asked him, I said, Is it possible that you could have shot Mr. Boone? And he said, Yeah, I guess it's possible.
>
> This is right at the end. He said. Yeah, I guess it's possible. He put his head down and shook his head and that was actually the end of the interview.

The state also points to evidence surrounding the gunshot residue tests. Almost as soon as sheriff's officers had picked Babb up at the residence where Spencer went after her vehicle became stuck, they took him to Moscow and had several tests done on him, including urinalysis, blood tests, and a gunshot residue test. The gunshot residue test was negative. Babb, Boone, and Spencer were all tested for gunshot residue, and all the tests were negative. The test results are of little value. A forensic chemist testified that the gunshot residue test measures the presence of antimony and barium on a person's hands. The cartridge that killed Boone, however, did not contain antimony, and therefore left no measurable gunshot residue to test. This meant that the gunshot residue tests were destined to come up negative.

The state introduced evidence relating to the gunshot residue test as evidence of Babb's state of mind showing cognizance of guilt. A witness testified to the following conversation while Babb, Spencer, and Babb's half brother were waiting for the sheriff's officers to arrive at the residence where Spencer went after her vehicle became stuck:

A Well, we were just kind of talking and Kathy [Spencer]—like I said, was worried that everyone was going to think that they had killed Ron Boone because they had been the last ones to see him alive and—

Q That's what she said?

A Yes. And Roger [Babb] said, Well, don't—don't worry. He was trying to keep Kathy [Spencer] from worrying so much. This woman believes us, maybe other people will too. So I was trying to—to let them know what my feelings were. So I said, Well, when the police get here they'll know whether this is suicide or not. I mean, they can tell—cause I had just read an article and it said—and I was saying, They can tell by the distance the gun is from the head whether—the powder burns, whether he used his right or left hand.

Q And you told them that?

A That's what I told them. And I said, They'll be able to tell us, cause I planned on the police deciding what this was. I wasn't going to.

Q What reaction did you observe?

A And the room went dead still. There was—we'd been talking all the time. It was like I was in a vacuum. And the room was just completely silent, and I looked around at Kathy and she didn't say anything and I looked at Roger [Babb] and he didn't say anything. So I walked across the room to [Babb's half brother] and I said, Well, they can tell; can't they? And he thought a minute and he said, Yes. I said, Oh, thank God.

This witness also testified that, when the sheriff's officers arrived, Babb was in the bathroom, and that Babb came out of the bathroom and appeared to be wadding something up like he was wiping his hands on a paper towel. A sheriff's officer testified that, as Babb first approached the sheriff's officers that morning after apparently coming out of the bathroom, "he was rubbing his hands together. When he reached our location I noticed a water drop on his right wrist and what looked to be a water drop on his shirt, about center chest." Another officer testified:

As I recall we pulled in and a woman who was later identified to me as Kathy Spencer and a gentleman, [Babb's half brother], stepped outside and were talking. Shortly thereafter I observed Mr. Babb come out of the side entrance of the [residence where Spencer went after her vehicle became stuck]. I remember distinctly him wiping or ringing his hands as if he just come out of the washroom.

The state introduced various statements by Babb regarding the gunshot residue test and whether he had previously washed his hands or had previously shot any other guns. An officer testified that, prior to conducting the gunshot residue test on Babb, he asked Babb if Babb had washed his hands that morning. The officer testified that Babb answered that he had not washed his hands since he got home from work the night before.

This same officer also testified that Babb stated that the last time he had fired a gun was a long time ago. At trial, however, Babb testified that, shortly before noon on March 8, 1991, one day before Boone's death, Babb had stopped along the highway to help somebody who was having trouble with his truck. Babb testified that the truck had overheated and that he had given water to the man, that the man then asked Babb if Babb wanted to buy a couple of guns, and that Babb test-fired both guns, but did not buy them.

The state presented the testimony of other witnesses that was also inconsistent with Babb's testimony. Babb testified that when he entered Boone's bedroom the second time, there was a phone on top of the nightstand on the left side of the bed. Babb testified that he called home, that his half brother answered the phone and told him that Spencer was not there. A woman Boone was dating testified that she had never seen the telephone on the left side of the bed, and that the cord was taut when Boone sat on the other side of the bed talking. The state presented evidence that the telephone was not in Boone's bedroom, as Babb testified, that the telephone was in the dining room, and that the telephone extension cord would not reach to the nightstand where Babb testified he found the phone.

The state called as a witness a private investigator employed by Spencer, who testified that Babb had told him that he had been untruthful when he told the police he thought Boone was dead when he left Boone's house. This private investigator also testified that Babb had told him that Babb had wiped the telephone of fingerprints.

The state also introduced evidence of motive, including the testimony of the bartender at one of the bars in Potlatch who was on duty the night of March 8, 1991. She testified that Boone approached Spencer at the bar and began talking to her, while Babb was directly behind her, that Boone told Spencer "she had a beautiful body," and ordered drinks for himself, Spencer, and Babb. The bartender testified that Babb's reaction to the comment was that he "looked like his eyes started to snap a little bit," and the

bartender became concerned there would be a fight.

A witness at the residence where Spencer went after her vehicle became stuck testified that Spencer recounted the following events: Spencer and Babb had gone out drinking the night before, met Boone, and went back to Boone's residence. Spencer had "said that Ron Boone had made sexual advances. Wanted her to go to bed with him is what she said," and so she called Babb's half brother, who told her to get in her car and drive home. So she did and she drove her car into a ditch. The state introduced the testimony of Babb's half brother, who testified that at 4:15 a.m. on March 9, 1991, he received a call from Spencer, and that Spencer was "[v]ery shaky and very scared" and "[a]lmost hysterical." The phone records reveal a telephone call from Boone's residence to Babb's residence at 4:29 a.m. on March 9, 1991.

With regard to Boone's possible suicide, the state introduced the testimony of numerous witnesses who testified that Boone was a happy, vibrant individual who loved life, and who was planning for the future. They testified that Boone was financially secure. They also testified to previous statements by Boone counseling against suicide, calling suicide stupid, and calling someone who commits suicide a coward.

A general surgeon who was county coroner testified that his opinion was that Boone's death was the result of a homicide, rather than suicide.

We conclude that there is substantial evidence from which a rational trier of fact could have found beyond a reasonable doubt that Babb killed Boone, rather than Boone having committed suicide.

Concerning Babb's contention that there is not substantial evidence to support a finding of malice, the Court has stated: "By the use of a deadly weapon by one person upon another, and it results in unlawful homicide, then malice may be presumed." *State v. Snowden*, 79 Idaho 266, 272, 313 P.2d 706, 709 (1957).

Concerning Babb's contention that there is not substantial evidence to support a finding of premeditation, the Court has stated:

> To establish. the crime of first degree murder, direct evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from the proof of such facts and circumstances as will furnish a reasonable foundation for such an inference, and where the evidence is not in law insufficient, the matter is exclusively within the province of the trier of fact to determine.

*State v. Foley,* 95 Idaho 222, 223–24, 506 P.2d 119, 120–21 (1973).

Applying these standards, we conclude that there is substantial evidence from which a rational trier of fact could have found beyond a reasonable doubt that Babb killed Boone with malice aforethought and with premeditation.

## IX.

## THE DEFENDANT'S SENTENCE OF LIFE IMPRISONMENT WITH A FIXED TERM OF TWENTY YEARS WAS NOT UNREASONABLE.

Babb asserts that the sentence of life imprisonment, with a fixed term of twenty years, is unreasonable in light of the facts of this case. We disagree.

Pursuant to I.C. § 18–4004, for a conviction of first-degree murder, the trial court was required to sentence Babb to a life term, with a fixed term of at least ten years. At the sentencing hearing, the trial court recognized a number of mitigating factors it considered in imposing sentence: (1) this was Babb's first conviction for a violent felony; (2) the trial court felt the state had not proven the motive for the killing; (3) Babb's intoxication; (4) the murder was not especially heinous, atrocious, cruel, or tortuous; (5) the trial court did not feel the defendant was beyond all rehabilitation, or that he posed such a threat to society that he should never be paroled. After discussing the purposes of sentencing, the trial court also stated:

> However, to impose—to merely impose the mandatory life sentence with the statu-

tory—statutorily mandated minimum period of confinement of only 10 years imprisonment would, in my opinion, depreciate the seriousness of the Defendant's offense.

Taking into consideration all of these factors, and indeed struggling with this sentencing process in light of the evidence that I heard, the same evidence that the jury heard, it is the judgment of the Court that the Defendant is guilty of the felony offense of murder in the first degree . . . [and] the Court imposes a life sentence, which sentence [shall] consist of a minimum period of confinement of 20 years. . . .

In *State v. Broadhead*, 120 Idaho 141, 814 P.2d 401 (1991), *overruled on other grounds*, *State v. Brown*, 121 Idaho 385, 394, 825 P.2d 482, 491 (1992), the Court stated that for us to overturn a sentence as unreasonable, we must be convinced that considering (1) the protection of society, (2) deterrence of the defendant and others, (3) the possibility of the defendant's rehabilitation, and (4) punishment or retribution for the defendant, the sentence was excessive under any reasonable view of the facts. *Broadhead*, 120 Idaho at 146, 814 P.2d at 406.

Babb argues that the trial court improperly made no findings supporting its decision that a twenty-year fixed term was necessary to protect society or accomplish any other goal of sentencing, and that the trial court erroneously implied that all first-degree murder convictions require at least a sentence of twenty years fixed or the seriousness of the offense will be depreciated.

In *State v. Follinus*, 124 Idaho 26, 30, 855 P.2d 863, 867 (1993), the Court stated:

We note that the trial court did not specifically state which of the objectives of sentencing it was considering in fashioning Follinus's sentence. This is not a basis for overturning the sentence. In *State v. Nield*, 106 Idaho 665, 666, 682 P.2d 618, 619 (1984), the Court reiterated, " 'that while the setting forth of reasons for the imposition of a particular sentence would be helpful and is encouraged, it is not mandatory.' " (quoting *State v. Osborn*, 104 Idaho 809, 810, 663 P.2d 1111, 1112 (1983)).

The trial court considered a number of factors in sentencing Babb, including "the protection and good order of society," as well as "deterrence, rehabilitation, or retribution." The trial court also considered, along with the mitigating factors listed above, that "Mr. Boone's death resulted from the infliction of a strategically and lethally placed single gunshot wound while Mr. Boone was asleep."

The trial court was not required to make a more detailed statement of its reasons for imposition of the sentence. We cannot say that the sentence was excessive under any reasonable view of the facts.

## X.

## CONCLUSION

We affirm the conviction and sentence.

McDEVITT, C.J., and BISTLINE, TROUT and SILAK, JJ., concur.