**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 47260**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | |
| | ) | **Filed: February 17, 2021** |
| **Plaintiff-Respondent,** | ) | |
| | ) | **Melanie Gagnepain, Clerk** |
| **v.** | ) | |
| | ) | |
| **WILLIAM P. TAYLOR,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. Gene A. Petty, District Judge.

Judgment of conviction for first degree murder, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Elizabeth A. Allred and Sally J. Cooley, Deputy Appellate Public Defenders, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Kale D. Gans, Deputy Attorney General, Boise, for respondent.

_____

BRAILSFORD, Judge

A jury convicted William P. Taylor of first degree murder, Idaho Code §§ 18-4001, 18-4002, 18-4003; second degree murder, I.C. §§ 18-4001, 18-4003(g); and two counts of failing to report a death to law enforcement, I.C. § 19-4301A(3). Taylor moved for a judgment of acquittal under Idaho Criminal Rule 29 on the first degree murder charge, and the district court denied the motion. On appeal, Taylor challenges the sufficiency of evidence of the first degree murder conviction. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

The State charged Taylor with first degree murder for killing his father, Paul Taylor; second degree murder for killing his mother, Mary Jane Taylor; and two counts of failing to report a death to law enforcement. Taylor pled not guilty, and the case proceeded to trial.

1

At trial, the State presented evidence that Taylor moved into his parents' house in Nampa, Idaho, in October 2015 and continued to reside with them at the time of the murders in September 2017. Several months before the murders in June 2017, Taylor wrecked his car, was convicted of driving under the influence, had his driver's license suspended, and lost his job. As a result, Taylor was dependent on his parents who would not allow him to drive their vehicles and did not provide him money. Rather, Taylor's teenage daughter testified that Taylor occasionally asked her for money and that she sometimes gave him money to buy cigarettes. Further, Paul and Mary Jane did not allow Taylor to smoke, to drink alcohol, or to have a dog in their house.

The State also presented evidence about when Paul was last seen on September 8 and about Taylor's conduct between that sighting and the discovery of Paul's and Mary Jane's bodies on September 14. A friend of Paul's testified he last saw Paul on the afternoon of September 8 at a local golf course where they played cards. According to the friend, he and Paul had golfed together for years, but Paul "had a lot of surgeries" and "couldn't golf anymore because of the pain in his back and legs" so they often played cards at the course instead. Further, the friend testified that he and Paul planned to play cards again the following day and that the last thing Paul said to him on September 8 was "I'll see you tomorrow."

That same day, September 8, Taylor texted his first ex-wife in the early evening and asked her to call him. Taylor's ex-wife testified that when she called Taylor, he inquired about his dog, which she was caring for while Taylor was living with Paul and Mary Jane. Taylor said he could have his dog at his parents' house and asked if he could come get the dog. When his ex-wife asked whether it was really true he could have the dog at his parents' house, he laughed and replied, "Oh, I can see how you might think that, but no, this is true. I can have the dog there." Taylor's ex-wife described Taylor's demeanor during the conversation as "happy," "familiar," and the opposite of "unusual."

On September 9, Paul did not come to play cards at the golf course as planned. His friend testified that he called Paul, who "was seldom late," but that he did not answer. Also on September 9, Taylor picked up his dog from his ex-wife's house while she was out, and he had numerous contacts with others about his parents' whereabouts. In the morning, Taylor called a neighbor and left a message saying "that his mother was ill and that he could not come mow" the neighbor's lawn. Taylor also visited an elderly neighbor who Mary Jane drove to church and

2

told the neighbor Mary Jane "wasn't going to be able" to pick her up for church on Sunday because Paul and Mary Jane were "out of town." The neighbor testified that Taylor looked "pretty red in the face . . . like he was just wore [sic] out or something" and that she later saw him driving Paul's truck around the neighborhood. Taylor also called his sister on September 9 and told her that Paul and Mary Jane "had decided to go to the coast"; Mary Jane had asked him to call her so she would not worry; and if she was not able to "get ahold of [Mary Jane]" on Mary Jane's upcoming birthday on September 12, not to worry. Taylor's sister testified that during this call Taylor "sounded good" and "clear" and that she "took that as a sign [Taylor] was doing well."

Over the next two days on September 10 and 11, surveillance footage from several local grocery stores showed Taylor buying a variety of products, including cleaning supplies. On the morning of September 10, Taylor bought a scrubbing pad, trash bags, carpet cleaner, Clorox wipes, a padlock, dog snacks, and a beer mug. On the following morning, Taylor purchased a scrub brush, hydrogen peroxide, and a package of 39-gallon trash bags. Later that morning, Taylor bought more Clorox wipes and two rolls of duct tape.

In the afternoon of September 11, Taylor emailed his second ex-wife explaining, "I injured my back this morning, and it will be impossible for me to see the boys tonight[.] I apologize." Taylor texted his daughter similarly stating, "I injured my back today. I will live, but I am not going to Boise to see the boys tonight." When his daughter asked how he had injured his back, he replied, "I lifted something too heavy the wrong way."

By September 14, Taylor's daughter was concerned because she had not heard from Paul, Mary Jane, or Taylor. That evening Taylor's daughter, his first ex-wife, and her husband drove to Paul and Mary Jane's house. When they arrived, they noticed that Paul's truck was missing and that a pool of liquid was leaking from the carport shed onto the patio. Also, they "immediately started noticing a smell" coming from the shed. After ringing the doorbell and knocking on the door, Taylor's ex-wife went to the shed to locate a house key and discovered Paul's body on the shed floor next to Mary Jane's body, which was wrapped in a blue tarp.

On this same night that Paul's and Mary Jane's bodies were discovered, a Deschutes County Sheriff's deputy discovered Taylor near Bend, Oregon, sleeping in a truck with stolen

plates. After being advised of his *Miranda*[1] rights, Taylor explained he had been on a "bender" because he was an alcoholic and had returned home to find his parents dead. An Oregon officer testified that Taylor said "he was scared," "didn't know what to do," had "attempted to clean them up," had "attempted to roll them up and move them," and then took the truck and traveled to Oregon. Taylor claimed he did not know what happened to Paul and Mary Jane, "but something had happened with their faces." The officers found blood on Taylor's shoes and on the truck's tailgate. DNA testing confirmed the former was Mary Jane's blood, and the latter was Paul's blood.

At trial, the State presented extensive evidence of the crime scene, including voluminous photographs. These photographs and the accompanying testimony showed, for example, that when executing a search warrant, the officers "did not see any signs of forced entry" and had to break open the front door with a door ram. Once inside, they discovered evidence of an attempt to clean the crime scene including cleaning supplies such as Clorox wipes, garbage bags, hydrogen peroxide, and a scrub brush. They also discovered several items with blood on them including shoes, vinyl gloves, and towels. Further, they discovered numerous empty beer cans throughout the house, many of which had Taylor's fingerprints on them. Outside the house, the officers discovered a ladder, a shovel, a hacksaw, and two trash cans containing numerous bloody items.

The State also presented extensive photographic evidence of blood in the house, including in the master bedroom and in another "northwest bedroom" identified as Taylor's. The criminologist, who supervised the crime scene investigation, analyzed the blood stains. She testified that DNA test results established the blood in the northwest bedroom was Mary Jane's. A pool of moldy blood had soaked into the carpet near the bedroom closest, and blood was on the closest door in a "spatter pattern with radiating impact" meaning something came into contact with the blood, causing droplets to fly through the air. Also, a "continuous swipe pattern" of Mary Jane's blood on the carpet went from the northwest bedroom into the hallway through the living room to the threshold of the master bedroom and ending inside the master bedroom. This pattern indicated "something was being drug between the northwest bedroom and

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[the master bedroom]." Someone had attempted to clean up this swipe mark by cleaning the carpet and covering portions of it with a rug and a chair.

The criminologist also testified about her analysis of the blood in the master bedroom. She testified that DNA test results established the blood in the master bedroom was Paul's. The bed had been stripped of bedding and was saturated in blood. Blood droplets were on the headboard and the wall behind it, perhaps indicating one or more impacts. Blood droplets were also on the TV, the doorjamb, the closet, and the wall. Regarding these latter droplets, the criminologist testified that they "could possibly be" "falling out of a parabola" meaning the droplets could have been "castoff" or blood cast off a weapon during another strike.

Finally, the State presented evidence regarding the nature of Paul's and Mary Jane's injuries, including the testimony of the pathologist who conducted the autopsies of their bodies. The pathologist testified that Paul had a "severe fracture" on his left temple area and his thyroid cartilage and hyoid bone in his neck were also fractured. Further, the pathologist testified that these injuries would have taken a "significant amount of force" to cause; were consistent with strangulation or blunt force trauma; and were likely caused by "more than one blow" or "multiple strikes," although he could not say with certainty. The pathologist also testified Mary Jane had a skull fracture, a broken jaw, and numerous stab wounds on her neck. In addition to the pathologist's testimony, the State admitted in evidence numerous photographs of Paul's and Mary Jane's bodies.

At the close of the State's evidence, Taylor moved for a judgment of acquittal under I.C.R. 29 on the first degree murder charge, arguing the State failed to prove Paul's murder was premeditated. The district court denied this motion, reasoning that Paul was killed while sitting or lying in his bed; he died of blunt force trauma, which required significant force; and "picking up a weapon to use to cause that blunt force trauma" required "some thought." The jury found Taylor guilty on all four counts. Taylor timely appeals his conviction for first degree murder.

## II.

## STANDARD OF REVIEW

Appellate review of the sufficiency of the evidence is limited in scope. A finding of guilt will not be overturned on appeal where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt. *State v. Herrera-Brito*, 131 Idaho 383, 385, 957

5

P.2d 1099, 1101 (Ct. App. 1998); *State v. Knutson*, 121 Idaho 101, 104, 822 P.2d 998, 1001 (Ct. App. 1991). We will not substitute our view for that of the trier of fact as to the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn from the evidence. *Knutson*, 121 Idaho at 104, 822 P.2d at 1001; *State v. Decker*, 108 Idaho 683, 684, 701 P.2d 303, 304 (Ct. App. 1985). Moreover, we will consider the evidence in the light most favorable to the prosecution. *Herrera-Brito*, 131 Idaho at 385, 957 P.2d at 1101; *Knutson*, 121 Idaho at 104, 822 P.2d at 1001.

Similarly, when reviewing the denial of a motion for judgment of acquittal under I.C.R. 29, the appellate court must independently consider the evidence in the record and determine whether a reasonable mind could conclude that the defendant's guilt was proven beyond a reasonable doubt. *State v. Clark*, 161 Idaho 372, 374, 386 P.3d 895, 897 (2016). The relevant inquiry is not whether the appellate court would find the defendant to be guilty beyond a reasonable doubt, but whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*; *see also State v. Willard*, 129 Idaho 827, 828, 933 P.2d 116, 117 (Ct. App. 1997) (ruling same standard applies to review of denial of I.C.R. 29 motion as review of substantial evidence to support verdict).

### III.

### ANALYSIS

The State alleged Taylor "willfully, unlawfully, deliberately, with premeditation, and with malice aforethought" murdered Paul. On appeal, Taylor contends the State failed to prove he premediated Paul's murder. To prove first degree murder, "[t]he intent to kill must be the result of deliberate premeditation." *State v. Snowden*, 79 Idaho 266, 273, 313 P.2d 706, 710 (1957). Premeditation requires the intent to kill "must be formed upon the pre-existing reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation." *Id.* at 273-74, 313 P.2d at 710. Premeditation, however, "does not require any appreciable space of time between the intention to kill and the killing; rather, it 'may be as instantaneous as two successive thoughts of the mind.'" *State v Johnson*, 136 Idaho 701, 704, 39 P.3d 641, 644 (Ct. App. 2001) (quoting *Carey v. State*, 91 Idaho 706, 710, 429 P.2d 836, 840 (1967)).

Direct evidence of a premediated purpose to kill is not required. *State v. Babb*, 125 Idaho 934, 947, 877 P.2d 905, 918 (1994). Rather, "[t]he necessary elements of deliberation and

premeditation may be inferred from the proof of such facts and circumstances as will furnish a reasonable foundation for such an inference." *Id.*; *see also State v. Bahr*, 163 Idaho 433, 436, 414 P.3d 707, 710 (Ct. App. 2018) ("A jury may infer such intent from the commission of acts and the surrounding circumstances."). "[W]here the evidence is not in law insufficient, the matter is exclusively within the province of the trier of fact to determine." *Babb*, 125 Idaho at 947, 877 P.2d at 918.

The Idaho Supreme Court has previously identified facts from which premeditation may be inferred. For example, in *State v. Aragon*, 107 Idaho 358, 366-67, 690 P.2d 293, 301-02 (1984), the Court concluded that evidence of a defendant's "pre-existing dislike for the victim," "prior incidents of mistreatment of the victim," and "previous threats against the victim" may furnish a reasonable foundation for an inference of premeditation. Also, "unusual and difficult to achieve" injuries "inflicted by extraordinary force" and by "more than one . . . blow" may "support a finding of a preconceived intent to kill." *Id.* at 367, 690 P.2d at 302. Further, the Court concluded the defendant's demeanor after the injuries were inflicted may provide a basis to infer premeditation. *Id.* Such conduct, for example, may include the defendant's calm demeanor, his refusal to aid the victim or to seek help, and his efforts to cover up the crime. *Id.*

On appeal, Taylor contends "the State's theory of first degree, premediated murder" required it to prove he "struck and killed Paul Taylor after his wife." Taylor argues that "because the State offered *no* evidence demonstrating which of the victims was killed first, [his] first degree murder conviction is not supported by substantial evidence." Further, Taylor argues that "because the time of death, date of death, and murder weapon were all unknown, the State failed to show Paul Taylor was killed after Mary Jane Taylor." We disagree with Taylor's assertion that the State necessarily had to prove Taylor killed Paul after murdering Mary Jane to establish Taylor's premeditation for Paul's murder.

Taylor cites no authority in support of his assertion that because two murders occurred, the State was required to prove Paul was murdered after Mary Jane to show premeditation. Further, Taylor's assertion ignores the State's substantial proof of facts establishing a reasonable foundation from which the jury could infer premeditation. These facts include, among others, that Paul was killed by blunt force trauma caused by a weapon used with significant force and likely inflicted by multiple strikes. In addition to fracturing his thyroid cartilage and hyoid bone,

Paul had a "severe" skull fracture, which the prosecutor described during closing argument as "an enormous hole in his skull" the size of a "baseball."

Additionally, Taylor's demeanor and conduct following Paul's failure to show at the golf course as planned on September 9 support an inference of premeditation. Most notably, Taylor's statements to the Deschutes County officers about his efforts to attempt to clean up and move Paul's and Mary Jane's bodies provide a reasonable foundation for an inference of premeditation. Likewise, the extensive efforts to clean up the crime scene following Taylor's purchase of cleaning supplies like those found at the crime scene provide such a foundation. Also, Taylor's communications--with his ex-wives, his daughter, his sister, and his parents' neighbors--show that Taylor did not exhibit any indication that he had discovered his parents murdered but rather he appeared "happy," "sounded good," was "doing well," and was calmly telling conflicting stories about his parents' whereabouts.

Finally, that Paul was murdered in his bed provides a reasonable foundation for an inference Taylor premeditated Paul's murder. Taylor concedes on appeal that "[v]iewing the evidence in the light most favorable to the State, Paul Taylor was killed while either sitting or lying in bed, in his bedroom." Taylor argues, however, that "the sole fact that a victim was sitting or lying down when struck and killed is not sufficient evidence to show premeditation." This argument ignores that Paul was murdered in a nonprovocative, vulnerable position, particularly given numerous witnesses' testimony that Paul frequently lied down during the day to alleviate chronic pain. Further, attacking a vulnerable victim may infer premeditation of murder. *See State v. Burris*, 80 Idaho 395, 400, 331 P.2d 265, 268 (1958) (noting victim incapable of effectively making attack on defendant and of resisting defendant's attack tended to show premeditated purpose to take victim's life). Taylor's argument also ignores the other facts, discussed above, supporting an inference of premeditation, including the nature of Paul's injuries and Taylor's demeanor, conduct, and statements to the police. Contrary to Taylor's argument, that Paul was murdered in his bed is not the "sole fact" the State presented establishing a reasonable foundation for an inference that Taylor premeditated Paul's death.

Based on a review of the evidence, we hold that the State presented substantial and competent evidence to prove beyond a reasonable doubt that Taylor premeditated Paul's murder. The circumstantial facts presented established a reasonable foundation to allow the jury to infer Taylor's premeditation. *See Babb*, 125 Idaho at 947, 877 P.2d at 918 (ruling premeditation may

8

be inferred from facts and circumstances furnishing reasonable foundation for inference); *see also State v. Severson*, 147 Idaho 694, 712, 215 P.3d 414, 432 (2009) (noting substantial evidence may exist even if solely circumstantial).

## III.

## CONCLUSION

Substantial and competent evidence supports the jury's verdict that Taylor premeditated Paul's murder and is guilty of murder in the first degree. Accordingly, the district court did not err in denying Taylor's I.C.R. 29 motion for judgment of acquittal, and we affirm the judgment of conviction.

Chief Judge HUSKEY and Judge LORELLO **CONCUR**.