908 P.2d 1211

STATE of Idaho, Plaintiff–Respondent,

v.

Zane Jack FIELDS, Defendant–Appellant.

Nos. 19185, 19809.

Supreme Court of Idaho,
Boise, September 1994 Term.

Feb. 16, 1995.

Rehearing Denied May 17, 1995.

Alan E. Trimming, Ada County Public Defender, and Amil N. Myshin, Jr., Deputy Ada County Public Defender, Boise, for appellant, Amil N. Myshin, Jr. argued.

Larry EchoHawk, Atty. Gen., Lynn E. Thomas, Deputy Atty. Gen., Boise, for respondent. Lynn E. Thomas argued.

McDEVITT, Chief Justice.

## I.

### BACKGROUND AND FACTS

This is an appeal from a conviction for first-degree murder and sentence of death for the killing of Katherine Marie Vanderford (Vanderford). The defendant, Zane Jack Fields (Fields) was charged by indictment with first-degree felony murder for killing Vanderford during the commission of a robbery and/or burglary at the Wishing Well Gift Shop in Boise.

Prior to trial, on March 16, 1990, Fields moved to suppress all witness identifications derived through photographic lineups on the grounds that the lineups were impermissibly suggestive. The district court denied this motion.

The State notified defense counsel of its intention to call several inmate witnesses in November 1989. Because several of these prospective witnesses were represented by the public defender's office, defense counsel moved to withdraw from the case on the grounds of a conflict of interest. The district

court granted this motion, and the trial date was vacated and reset to May 2, 1990. At trial, the only element of the State's case challenged by Fields was the identification of Fields as the perpetrator. Most of the material facts of this case are undisputed.

At approximately 11:15 a.m., February 11, 1988, Vanderford was stabbed to death while working at the Wishing Well Gift Shop (the Wishing Well) in Boise. The stabbing occurred during a robbery in which approximately fifty dollars in cash was taken. Vanderford was working alone in the shop at the time. Soon after the perpetrator left, Ralph P. Simmons (Simmons) arrived at the store. When Simmons arrived, Vanderford was speaking to the emergency dispatcher. Simmons put pressure on a wound on Vanderford's neck and began speaking with the dispatcher.

Ada County Police Detective Randy Folwell (Folwell), who was in the area at the time, heard the emergency dispatch and drove to the Wishing Well. Vanderford told Folwell that her attacker was a lone male who had left the store. Emergency medical personnel soon arrived and began treating Vanderford. Vanderford was immediately transported to Saint Alphonsus Hospital.

Dr. Frank J. Fazzio, Jr., the doctor who treated Vanderford when she arrived at the emergency room, testified that Vanderford was in full cardiac arrest upon arrival. Vanderford was never resuscitated. Dr. Fazzio opined that Vanderford's death was a result of loss of blood. Frank A. Roberts, the pathologist who performed the autopsy on Vanderford, similarly concluded that the cause of death was loss of blood as a result of stab wounds, primarily a neck wound.

The State also called a number of witnesses who identified Fields as a person they saw in or near the store immediately before and after the incident. Betty Hornecker (Hornecker) testified that she was in the Wishing Well at approximately 11:00 a.m. on February 11, 1988 when a man, who appeared to be acting strangely, came into the store and walked immediately to the back of the building. The man remained in the building after Hornecker left the store. Hornecker immediately contacted the police after reading about the murder the following day. Although the police used Hornecker's description to prepare a composite drawing of the suspect, she was unable to make an identification from a photographic lineup provided by police. Another witness, Murie Jan Munk, had been in the Wishing Well at approximately 11:05 or 11:10 a.m. the day of the murder. She saw a man in the store at the time, although she could not describe his face. All she was able to remember was that he was "fat and sloppy, a little over six feet tall." The man was still in the store when she left.

Nancy Carol Miller (Miller), an employee at Quilter's Crossing, a craft store at the intersection of Liberty and Fairview, testified that a man came into Quilter's Crossing at approximately 12:30 p.m. Miller testified that her attention was drawn to the man because it is rare for a man to come into the store and because the man had "wild looking eyes." Miller also noted that the man appeared to have a brown wooden-handled knife in his right coat pocket. Miller later telephoned the police when she read that they were seeking information about possible suspects in the Wishing Well incident. The police showed Miller a photographic lineup, from which she identified Fields as the man who had been in the store. She also identified Fields in court. Miller stated that after Fields left her store, she saw him go into T-Shirts Plus, a neighboring store.

Vicky Tippetts (Tippetts), an employee at T-Shirts Plus, testified that a "wild looking man," who appeared to have a wooden-handled knife sticking out of his pocket, came into the store. When Tippetts asked the man if she could help him, he said no, but kept staring at her and at the cash register. After approximately five minutes, the man left the store. Tippetts identified Fields in the photographic lineup, as well as in court, as the man who had been in her store that day.

The next witness was Robert D. Starbrad (Starbrad), an employee at Videon, a video

rental and sales store located near the Wishing Well. Starbrad testified that, at 12:15 p.m., he received a call from another Videon store, informing him of the Wishing Well robbery. At approximately 12:30 p.m., a man Starbrad later identified as Fields came into the store. The man's odd appearance and behavior made Starbrad nervous, and Starbrad contacted the store's manager to ask that someone keep an eye on the man while he was in the store. Starbrad identified Fields as the man who had been in the store in both the photographic lineup and in court. The retail floor manager at Videon, Timothy S. McWilliams (McWilliams), testified that Starbrad contacted him about a man in the store, and identified Fields as the man who had been in the store when shown a photographic lineup by police.

The State also called Keith Edson (Edson), who first met Fields while serving a prison sentence for grand theft auto in 1982. Edson and Fields were in protective custody together while they were both in prison. Edson was walking on Fairview Avenue the morning of the murder when he saw a man he vaguely recognized go into the Wishing Well. The man came out of the store looking nervous and upset. It was not until Edson heard Fields' name on television ten days later that he was able to remember the name of the person he saw.

Most of the State's remaining witnesses were inmates who testified about statements Fields made about the killing while in jail. The first such witness was Jeffrey L. Acheson (Acheson), Fields' roommate at the Ada County Jail while Fields was awaiting trial on charges stemming from an incident at the ShopKo store in Boise. Acheson testified that whenever a "Crime Stoppers" report about the incident at the Wishing Well came on television, Fields would get upset and nervous and change channels, turn the television off, or turn the down the volume. Acheson also testified that Fields said "they can't pin that on me," because Fields "took care of the evidence."

Joe Heistand (Heistand), another inmate at the County Jail, testified that Fields said he had been near the Wishing Well a few times before the incident looking for a "possible score," and had noticed that an "old lady ran the store and was alone." Fields further told Heistand that Vanderford began screaming and hollering when she saw him taking money out of the cash register. Fields told Vanderford to cooperate but, when she continued to scream, he stabbed her. Fields also told Heistand that he took between forty eight and fifty dollars from the till, and that Vanderford was still alive when he left the store. Heistand further testified that Fields told him that Fields expected his roommate Jim to testify that Fields was not in Boise at the time of the murder, but Fields' roommate had already contacted the police and given a different statement.

Scott Bianchi (Bianchi), another inmate, testified that Fields told him that, although he killed Vanderford, he did not mean to do so and felt bad. Bianchi was also approached by an investigator working for Fields before the preliminary hearing. Bianchi stated that Fields asked him to testify falsely at the preliminary hearing, but Bianchi told the investigator that his testimony "wouldn't be helpful."

Fields' case consisted of two brief witnesses. The first was Mark Ayotte, a detective with the Boise City Police Department, who testified that he had contacted approximately nine contractors who had been at BMC West on Fairview the day of the murder, as well as several jail inmates. The second witness was Robert W. Jue, a Department of Health and Welfare district health inspector, who testified that the Taco Bell on Fairview opened to the public on February 23, 1988, and was not operational on February 11 of that year. This testimony was presumably offered to impeach Edson's testimony that he bought a drink at Taco Bell while out walking the morning of the murder. Fields did not testify.

The jury found Fields guilty of first-degree murder, finding that the murder was committed during the commission of a burglary and/or robbery. Fields moved for a judg-

ment notwithstanding the verdict, claiming that the evidence was not sufficient to support the jury's verdict. The district court denied this motion.

On July 17, 1990, Fields moved for a new trial based on newly discovered evidence. At an evidentiary hearing on the motion for a new trial Fields attempted to establish through an inmate, Salvador Martinez (Martinez), that the inmate witnesses had lied during the trial. The district court denied the motion, holding Fields did not meet his burden of proving that the additional evidence would have probably resulted in a different verdict. The district court then conducted a sentencing hearing, after which it sentenced Fields to death.

On April 18, 1991, trial counsel filed an application for post-conviction relief. On December 31, 1991, an amended application for post-conviction relief was filed with the district court. Trial counsel then withdrew, and the public defender's office was reappointed to conduct the uniform post-conviction proceedings and appeals. Fields filed a notice of appeal from the verdict and sentence (Case No. 19185)`on February 27, 1992.

After an evidentiary hearing and oral argument, the district court issued a memorandum decision and order denying Fields' petition for post-conviction relief. Fields thereafter filed another amended application for post-conviction relief, and a motion for a new trial in the post-conviction proceeding, asserting that defense counsel had not allowed Fields to testify at trial on his own behalf. At a hearing on this motion, Fields' trial counsel testified that both of Fields' attorneys at trial discussed Fields' Fifth Amendment privileges with Fields. One of Fields' attorneys advised Fields to testify and the other attorney counseled Fields against taking the stand on his own behalf. Finding that Fields made the decision not to testify and that the decision was not the product of ineffective assistance of counsel, the district court denied Fields' motions.

Fields then moved for a new trial in the post-conviction proceedings, claiming that one of the State's material witnesses, Scott Bianchi, had recanted the testimony given at trial. The district court heard evidence on the matter, including a statement from Bianchi that his testimony at trial had been true, and denied the motion. Fields then filed a notice of appeal from the post-conviction proceedings. (Case No. 19809.)

Fields raises the following issues on appeal:

A. Whether the district court's admission of Fields' hearsay statements to inmate witnesses violated Fields' right to counsel.

B. Whether the means used to obtain Fields' confession violated guarantees of fundamental fairness to such an extent that Fields' Fifth Amendment Due Process rights were violated.

C. Whether Fields' Sixth Amendment right to counsel was violated by the admission of his hearsay statements to inmate witnesses made after a warrant was obtained for his arrest in this case.

D. Whether Fields' rights under Article I, Section 13 of the Idaho Constitution were violated by the admission of his hearsay statements.

E. Whether witness identifications of Fields were impermissibly tainted by media publication of Fields' photograph.

F. Whether Fields was denied his right to testify on his own behalf through ineffective assistance of counsel.

G. Whether the district court erred by denying Fields' motion for a judgment of acquittal based upon insufficiency of evidence.

H. Whether the district court erred by denying Fields' motion for a new trial based on newly discovered evidence.

I. Whether the district court erred by denying Fields' motion for a new trial based on the recantation of a material witness for the State.

J. Whether the district court erred by sentencing Fields to death.

## II

### THE ADMISSION OF FIELDS' STATEMENTS TO INMATE WITNESSES DID NOT VIOLATE FIELDS' CONSTITUTIONAL RIGHTS

In his first four issues on appeal, Fields contends that the district court erred by admitting the testimony of Bianchi, Acheson, and Heistand. Fields argues that the inmates who testified at trial were acting as agents of the police and unconstitutionally interrogated Fields in order to obtain his confession.

■ The Sixth Amendment to the United States Constitution and Article I, Section 13 of the Idaho Constitution clearly bar admission of statements deliberately elicited by governmental agents from an incarcerated defendant who is represented by counsel. *United States v. Henry,* 447 U.S. 264, 270, 100 S.Ct. 2183, 2186–87, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964); *State v. Fain,* 116 Idaho 82, 85, 774 P.2d 252, 255, *cert. denied,* 493 U.S. 917, 110 S.Ct. 277, 107 L.Ed.2d 258 (1989). However, this prohibition does not require that testimony be excluded where inmate informants have not made any affirmative effort to elicit statements from the defendant or initiated conversations about the alleged crime. In order to establish that he was subjected to an unconstitutional interrogation, Fields must " 'demonstrate that the police and their informant[s] took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.' " *Fain,* 116 Idaho at 85, 774 P.2d at 255 (*quoting Kuhlmann v. Wilson,* 477 U.S. 436, 459, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986)).

■ The inquiry into such possible Sixth Amendment violations requires that this Court determine whether (1) the inmates were acting as agents of the police, and (2) the informants affirmatively and deliberately elicited the incriminating statements. *See Depree v. Thomas,* 946 F.2d 784, 793 (11th Cir.1991) ("To establish his claim, [the defendant] 'must show (1) that a fellow inmate was a government agent; and (2) that the inmate deliberately elicited incriminating statements

from' him.") (*quoting Lightbourne v. Dugger,* 829 F.2d 1012, 1020 (11th Cir.1987) (per curiam), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988)).

■ The State called three inmate witnesses to testify at trial. The first witness, Acheson, had no contact with the police relevant to this case until after Fields had made the statements about which Acheson testified. Absent any communication between Acheson and the police prior to Fields' statements, Acheson could not be acting as a police agent. *See Fain,* 116 Idaho at 85, 774 P.2d at 255. Therefore, Acheson was not acting as a police agent and neither the United States Constitution nor the Idaho Constitution require suppression of his testimony. However, the State's remaining inmate witnesses, Heistand and Bianchi, testified that the police contacted them about listening for incriminating statements by Fields before Fields made most of the statements about which they testified.

Acheson, Bianchi, and Heistand all testified that they never questioned Fields about the crime; each of the inmate witnesses testified that they were not promised anything in exchange for their testimony; and the police testified that each witness was instructed not to actively question Fields. Fields, whose trial strategy was apparently to deny that any of the conversations with the inmate informants took place, presented no evidence to establish that the informants asked any questions or initiated any conversations about the murder. The record presents no evidence indicating that any of the inmate informants who testified at trial deliberately elicited information from Fields. The district court therefore did not err in concluding that Fields was not subjected to an unconstitutional interrogation under either the Idaho Constitution or the United States Constitution.

## III.

### THE EYE–WITNESS IDENTIFICATIONS OF FIELDS WERE NOT IMPERMISSIBLY TAINTED BY MEDIA PUBLICATION OF FIELDS' PHOTOGRAPH

■ Fields concedes that he did not object to the admission of this evidence at trial.

This Court will not consider an issue not raised in the district court unless the party raising the issue on appeal shows that the error is fundamental. *State v. Lavy*, 121 Idaho 842, 844, 828 P.2d 871, 873 (1992). This Court has adopted the following definition of fundamental error:

> Error that is fundamental must be such error as goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive. Each case will of necessity, under such a rule, stand on its own merits. Out of the facts in each case will arise the law.

*State v. Sarabia*, 125 Idaho 815, 818, 875 P.2d 227, 230 (1994) (*quoting State v. Knowlton*, 123 Idaho 916, 918, 854 P.2d 259, 261 (1993)); *State v. Bingham*, 116 Idaho 415, 423, 776 P.2d 424, 432 (1989), *quoted in State v. Johnson*, 126 Idaho 892, 896, 894 P.2d 125, 129 (1994).

■ Looking to the facts of this case, nothing in the record from either the trial or the post-conviction proceedings shows that the media publication of Fields' photograph took place before the witnesses identified Fields in the photographic lineups. Similarly, Fields has made no showing that any of the witnesses were actually exposed to or were aware of the publication of Fields' photograph in the media. Any potential prejudice that Fields claims may have resulted from the admission of the witnesses' identifications is entirely speculative and does not rise to the level of fundamental error. *See State v. Lankford*, 113 Idaho 688, 747 P.2d 710 (1987) (district court's failure not to question jurors about adverse effect of pretrial publicity not fundamental error), *rev'd sub nom. on other grounds Lankford v. Idaho*, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991); *State v. Babb*, 125 Idaho 934, 940, 877 P.2d 905, 911 (1994) (" 'An abuse of discretion in admitting evidence is a trial error and does not go to the foundation of the case or take from the defendant a right which was essential to [the defendant's] case.' ") (*quot-*

*ing State v. Bingham*, 116 Idaho 415, 423, 776 P.2d 424, 432 (1989)). Because this evidence was not objected to at trial, and the admission of this evidence does not rise to the level of fundamental error, this issue will not be addressed by this Court on appeal.

## IV.

## FIELDS WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL

In his amended application for post-conviction relief, Fields claimed that his trial counsel failed to adequately advise Fields about his right to testify on his own behalf and did not allow Fields to truthfully testify on his own behalf at trial. Both of the attorneys who represented Fields at trial testified at the post-conviction proceedings, after which the district court issued a memorandum opinion and order concluding:

> There appears to have been a difference of opinion between trial counsel as to whether Mr. Fields should testify or not. Mr. Hackney indicated that he advised Mr. Fields strongly not to take the witness stand. Mr. Lynn indicated that prior to trial he wanted Mr. Fields to testify but that Mr. Fields consistently said no. Despite any differences of opinion that may have existed between trial counsel, it is clear that neither prevented Mr. Fields from testifying. He knew of his right to testify. There were serious risks for him if he did testify by way of impeachment and his demeanor. Acting with the advice of competent counsel he made the decision not to testify. This claim for relief is denied.

C.R. 234. Fields also testified at the post-conviction proceedings, stating that he felt that his trial counsel would not allow Fields to offer the testimony Fields wished to give at trial. Fields argues on appeal that, in light of Fields' testimony at the post-conviction proceeding and the limited record Fields' trial counsel made of Fields' election not to testify at trial, the district court erred by denying Fields' petition for relief.

To make out a claim of ineffective assistance of counsel, the burden is on Fields to establish that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) that the deficient conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Ivey v. State*, 123 Idaho 77, 80, 844 P.2d 706, 711 (1992); *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). This standard requires that the defendant prove to a reasonable probability that the result of the trial would have been different but for the deficient performance of trial counsel. *State v. Pratt*, 125 Idaho 546, 568, 873 P.2d 800, 822 (1993).

Fields asserts that the conduct of trial counsel effectively denied Fields the right to testify on his own behalf. The record from the post-conviction proceedings provides ample evidence that, although the attorneys representing Fields at trial had differing opinions on the tactical costs and benefits of having Fields testify, the ultimate decision on this issue was left to Fields. We therefore agree with the district court's conclusion that Fields was not denied the effective assistance of counsel, nor was Fields deprived of his right to testify on his own behalf.

Fields also appears to assign error to the district court's failure to question Fields about the voluntariness of his waiver of the right to testify. This Court has previously rejected the proposition that the district court should secure an on-the-record waiver of the right to testify when the defendant does not testify on his or her own behalf. *Aragon v. State*, 114 Idaho 758, 763, 760 P.2d 1174, 1179 (1988). In *Aragon*, this Court recognized that requiring the district court to secure an on-the-record waiver from the defendant might " 'provoke substantial judicial participation that could frustrate a thoughtfully considered decision by the defendant and counsel who are designing trial strategy.' " *Id.* (*quoting People v. Simmons*, 140 Mich.App. 681, 684–86, 364 N.W.2d 783, 785 (1985)); *see also United States v. Joelson*, 7 F.3d 174, 177 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 620, 126 L.Ed.2d 584 (1993) (The trial court "has no duty to advise the defendant of his right to testify, nor is the court required to ensure that an on-the-record waiver has occurred.") (quotation and citation omitted).

## V.

## THE DISTRICT COURT DID NOT ERR BY DENYING FIELDS' MOTION FOR A JUDGMENT OF ACQUITTAL

Fields contends that the evidence does not support the conclusion that Fields entered the store with the intent to commit robbery or that Fields committed the murder during the course of a robbery. As such, Fields argues that there is no reasonable factual basis for the jury's conclusion that Fields is guilty of first-degree felony murder.

The test to be applied by the district court when ruling on a motion for a judgment of acquittal, and by this Court when reviewing the district court's ruling, is to determine whether the evidence was sufficient to sustain a conviction of the crime charged. *State v. Holder*, 100 Idaho 129, 131, 594 P.2d 639, 641 (1979). This determination is made mindful of the fact that " '[t]he credibility of the witnesses and the weight to be given their testimony are matters for the jury, not the court.' " *Id.* (*quoting State v. Lewis*, 96 Idaho 743, 748, 536 P.2d 738, 743 (1975)). All facts, as well as all reasonable inferences to be drawn from those facts, are construed in favor of the lower court's decision. *State v. Charboneau*, 116 Idaho 129, 144, 774 P.2d 299, 314, *cert. denied*, 493 U.S. 922, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989), *overruled on other grounds, State v. Card*, 121 Idaho 425, 433, 825 P.2d 1081, 1089 (1991); *State v. Aragon*, 107 Idaho 358, 366, 690 P.2d 293, 301 (1984).

Fields does not claim that the State failed to present evidence that he en-

tered the store with the intent to commit a robbery or burglary. Instead Fields contends that the only witness who presented direct evidence on this issue, Heistand, is inherently unreliable. Fields does not assert that the district court erred by admitting Heistand's testimony, but instead challenges the weight given that testimony by the jury. This Court has rejected the proposition that the testimony of inmate informants is "inherently unreliable" as asserted by Fields, and this Court will not substitute its opinion of a witness' credibility for that of the jury. *State v. Rhoades,* 120 Idaho 795, 803–04, 820 P.2d 665, 673–74 (1991), *cert. denied,* 504 U.S. 987, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992). The record presents sufficient evidence to sustain a conviction of the offense charged. The district court did not err by denying Fields' motion for a judgment of acquittal.

## VI.

## THE DISTRICT COURT DID NOT ERR BY DENYING FIELDS' MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

 In support of his motion for a new trial, Fields presented testimony from Salvador Martinez, an inmate at the Idaho State Penitentiary. Martinez testified that inmate witnesses Bianchi, Gilchrist, and Heistand admitted to Martinez that they lied in this and other cases to receive benefits from the State. The district court agreed with Fields' contention that Martinez's testimony was newly discovered evidence under the standard set out in *State v. Drapeau,* 97 Idaho 685, 551 P.2d 972 (1976). However, the district court concluded that Fields failed to show that the newly discovered evidence probably would have resulted in an acquittal as required by that standard.

The decision to grant or deny a motion for a new trial is a matter within the sound discretion of the district court. *State v. Powell,* 125 Idaho 889, 891, 876 P.2d 587, 589 (1994); *State v. Lewis,* 123 Idaho 336, 352,

848 P.2d 394, 410 (1993); *State v. Lankford,* 116 Idaho 860, 873, 781 P.2d 197, 210 (1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990). This Court therefore limits its review of the district court's decision " 'only to determine if it has abused its discretion.' " *Powell,* 125 Idaho at 891, 876 P.2d at 589.

When ruling on a motion for a new trial, the district court must determine:

(1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence be material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that the failure to learn of the evidence was due to no lack of diligence on the part of the defendant.

*Drapeau,* 97 Idaho at 691, 551 P.2d at 978. After a hearing on Fields' motion, the district court concluded that the evidence was unknown at the time of trial and material, and that Fields had not failed to learn of the evidence through a lack of due diligence. However, the district court denied Fields' motion, concluding that the evidence offered by Martinez would not "probably produce an acquittal."

In reaching this conclusion, the district court noted that "[t]he testimony of Mr. Martinez was not believable to this court and would not be believable to a jury." The district court noted that Martinez's testimony appeared to lack credibility; that Martinez had previously offered inconsistent testimony in an unrelated proceeding; that the inmate informants had been separated from other inmates, making it highly unlikely that the conversations Martinez testified to could have taken place; that the inmate witnesses' testimony at the hearing was more credible than Martinez's testimony; and that there was no reasonable basis to conclude that, had the informants perjured themselves at trial, they would subject themselves to greater persecution inside the penitentiary by admitting that they falsely testified against a fellow inmate.

After examining the weight that the offered evidence would probably have had on

the jury's evaluation of the inmate informants' testimony, the district court then considered the likelihood that impeachment of that testimony would produce an acquittal. The district court considered both the evidence of Fields' guilt that was not affected by Martinez's testimony and the fact that the inmate informants were vigorously cross-examined on the issue of fabrication at trial. Based on these considerations, the district court concluded that Martinez's testimony would not produce an acquittal in a new trial.

■ Although Fields claims that the district court improperly considered Martinez's prior inconsistent statements, which were made at a hearing before the same district judge, this argument is without merit. Martinez's testimony at the prior proceeding is a matter of public record. Knowledge of Martinez's former inconsistent testimony was not uniquely personal to the district judge. The fact that Martinez was potentially subject to cross-examination about his prior inconsistent testimony need not be ignored by the judge when considering the weight that a jury would have given Martinez's testimony. The district court did not abuse its discretion in denying Fields' motion for a new trial.

## VII.

### THE DISTRICT COURT DID NOT ERR BY DENYING FIELDS' MOTION FOR A NEW TRIAL IN THE POST-CONVICTION RELIEF PROCEEDINGS BASED ON THE ALLEGED RECANTATION OF A MATERIAL STATE WITNESS

■ Fields moved for a new trial in the post-conviction relief proceedings on the basis of the alleged recantation of Bianchi. Bianchi admitted at a hearing on Fields' motion that he had informed other inmates and Fields' attorney that he, Bianchi, had lied at trial. Bianchi testified that after he was transferred to the facility where Fields was housed, Bianchi began receiving death threats. In response to these threats, Bianchi informed a number of people, including Fields' counsel, that he had lied at trial. After making these statements, the threats against Bianchi stopped. Bianchi also testified that his original testimony had been true, and that he told people that he had lied at trial in order to protect his life. The district court denied Fields' motion for a new trial, concluding that Bianchi had not falsely testified at trial.

■ The test applied by this Court when determining whether a new trial should be granted on the basis of recanted testimony was adopted from *Larrison v. United States,* 24 F.2d 82 (7th Cir.1928), *quoted in State v. Scroggins,* 110 Idaho 380, 385, 716 P.2d 1152, 1157, *cert. denied,* 479 U.S. 989, 107 S.Ct. 582, 93 L.Ed.2d 585 (1986). Under the *Larrison* test, a new trial should be granted where (1) the court is reasonably well satisfied that the testimony given by a material witness is false; (2) that without it the jury might have reached a different conclusion; and (3) that the party seeking the new trial was unable to meet it or did not know of its falsity until after the trial. *Id.* at 87.

Applying this test, the district court concluded that the testimony given by Bianchi at Fields' trial was not false. The district court noted that Bianchi had not recanted his trial testimony under oath, but had only made out-of-court statements to inmates and Fields' counsel after receiving death threats. After Bianchi again testified under oath that his trial testimony had been true, the district court concluded that it was not "reasonably well satisfied that the testimony given by a material witness is false[.]" *Larrison,* 24 F.2d at 87. Similarly, the district court noted that Bianchi was vigorously cross-examined, and the limited impeaching value of a prior inconsistent statement that was given in response to death threats.

■ Despite this Court's adoption of the *Larrison* test for material recantations, when the witness alleged to have recanted trial testimony later retracts the recantation, affirming the original testimony given at trial, this Court has held that the rigorous standard applied to newly discovered evidence

should be used. *State v. Ransom,* 124 Idaho 703, 712, 864 P.2d 149, 158 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1227, 127 L.Ed.2d 571 (1994). Applying the *Drapeau* test for considering newly discovered evidence to Bianchi's retracted recantation, we conclude that the district court properly denied Fields' motion for a new trial in the post-conviction proceedings.

The second and third prongs of the *Drapeau* test require that the district court consider whether the evidence is material, not merely cumulative or impeaching, and that the evidence would probably produce an acquittal. *Drapeau,* 97 Idaho at 691, 551 P.2d at 978. Similar to the recanted testimony discussed in *Ransom,* the witness in this case retracted the recantation at the hearing on the motion for a new trial. Thus, if Fields were granted a new trial, the recantation would serve as a prior inconsistent statement for impeachment purposes. Also, the district court noted that the limited impeachment value of an inconsistent statement made in response to death threats made the possibility that this evidence would result in an acquittal remote.

Given the circumstances surrounding Bianchi's recantation and Bianchi's sworn retraction of the recantation, we cannot conclude that the district court's denial of Fields' motion for a new trial was an abuse of discretion. *Cf. Bean v. State,* 119 Idaho 632, 809 P.2d 493 (1991) ("If the court determines that [the] revised testimony is both material and that it is true, then the court could make the final determination ..., whether justice requires the sentence to be changed.") (quotation and citation omitted); *State v. Lankford,* 116 Idaho 860, 874–75, 781 P.2d 197, 211–12 (1989) (trial court did not abuse its discretion denying motion for new trial where evidence supported findings that prior testimony was correct, recantation was not believable, and evidence would not probably produce different verdict).

### VIII.

### THE DISTRICT COURT DID NOT ERR BY SENTENCING FIELDS TO DEATH

Fields appeals the district court's sentence of death, arguing that the district court imposed the sentence under the influence of passion, prejudice, or another other arbitrary factor; the evidence does not support the finding of a statutory aggravating factor; and the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. After an independent review of the record from the trial and the post-conviction proceedings, we conclude that the sentencing judge correctly followed the dictates of I.C. § 19–2515.

### A. THE DEATH SENTENCE WAS NOT IMPOSED UNDER THE INFLUENCE OF PASSION, PREJUDICE, OR ANY OTHER ARBITRARY FACTOR

██ Fields argues that the sentence of death was imposed arbitrarily because the district court was biased against Fields as a result of having presided over a previous trial in which Fields was the defendant, was biased against Martinez as a result of having presided over Martinez's trial, and was unduly influenced by its sympathy for the victim as a result of her age. The record does not support this conclusion.

Although Fields asserts that the district court was biased against him as a result of having presided over a prior criminal trial in which Fields was a defendant, Fields alleges no specific incidence of prejudicial behavior on the part of the district judge. Fields' did not file a motion to disqualify the district judge from presiding over either the trial or the post-conviction proceedings. Also, nothing in the record supports the conclusion that the district judge was unable to, or failed to, perform the proper legal analysis the law requires. *See State v. Sivak,* 127 Idaho 387, 389, 901 P.2d 494, 496 (1995) (*Sivak IV*)94172125 ("If the judge can make the proper legal analysis, then the motion to disqualify should be denied.").

Fields' contention that the district judge was prejudiced against Martinez as a result of having presided over earlier proceedings involving Martinez is also without merit. Fields failed to either move to disqualify the

district judge or establish any prejudice that resulted from the district judge presiding over this case. Fields has also failed to establish prejudice as a result of the trial judge's prior association with Martinez or make any showing that having presided over separate matters involving Martinez rendered the district judge incapable of making the proper legal analysis required under *Sivak IV*.

The district court noted in its findings of fact in consideration of the death penalty that the age of the victim was a factor it considered. Fields contends that the district court was therefore unduly influenced by its sympathy for the victim. The district court's findings state that the district court considered the victim's age as relevant to the fact that she presented no threat to Fields. The district court also found that the victim's age and relative ability to defend herself was relevant to concluding that Fields had the specific intent to kill because the victim could have easily been overpowered without the use of deadly force. These considerations are directly relevant to the circumstances surrounding the commission of the murder. *See Tuilaepa v. California,* —— U.S. ——, ——, 114 S.Ct. 2630, 2637, 129 L.Ed.2d 750 (1994) ("[O]ur capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty.") (plurality opinion). Nothing in the record supports the conclusion that the sentence of death in this case was imposed under the influence of passion, prejudice, or any other arbitrary factor.

## B. THE EVIDENCE SUPPORTS THE FINDING OF A STATUTORY AGGRAVATING CIRCUMSTANCE

The district court originally found three aggravating circumstances beyond a reasonable doubt: (1) that the Fields "exhibited utter disregard for human life[,]" I.C. § 19–2515(g)(6); (2) that the murder was committed during the perpetration of a robbery and/or burglary, and was accompanied by an intent to cause death, I.C. § 19–2515(g)(7); and (3) Fields has "exhibited a propensity to commit murder which will probably constitute a continuing threat to society[,]" I.C. § 19–2515(g)(8). Twenty days after Fields was sentenced, the Ninth Circuit Court of Appeals held that this Court's limiting construction of the I.C. § 19–2515(g)(6) aggravating circumstance was unconstitutionally vague. *Creech v. Arave,* 928 F.2d 1481 (9th Cir.1991), *amended on denial of rehearing and rehearing en banc,* 947 F.2d 873 (9th Cir.1991).

After the Ninth Circuit decided *Creech,* the district court reconsidered Fields' sentence, holding that "at this stage of legal history the Ninth Circuit ruling precludes this court from considering I.C. § 19–2515(g)(6) as an aggravating circumstance." C.R. 228. The district court then noted that it had found two other statutory aggravating circumstances, each of which independently outweighed all mitigating factors, and denied Fields' request for resentencing. Although the United States Supreme Court ultimately reversed the Ninth Circuit Court of Appeals on that issue, *Arave v. Creech,* 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993), the district court had withdrawn its consideration of I.C. § 19–2515(g)(6) as an aggravating sentencing factor. The record before this Court therefore requires that we review the two remaining aggravating sentencing factors to determine whether the evidence supports the finding of a statutory aggravating factor.

Fields argues that the district court sentenced Fields to death without evidence sufficient to support a finding that Fields possessed the specific intent to kill. Fields was convicted of first degree felony murder. It was not necessary for the jury to find specific intent to kill in order to convict Fields of that offense. Nonetheless, the district court, in its findings of fact in consideration of the death penalty, found beyond a reasonable doubt that Fields possessed such intent. Fields' argument that the record does not support such a conclusion is based

on the assertion that Bianchi's testimony on this issue was equivocal, and Heistand's testimony should have been disregarded as unreliable.

Our review of the record supports the district court's finding of both aggravating factors relied upon by the district court. The record discloses that Fields possessed specific intent to kill, and that the killing was committed during the commission of a robbery and/or a burglary. Our review of the record of the trial, post trial proceedings, and the presentence investigation report also supports the district court's finding that Fields' conduct, both prior to and during the commission of this murder, displayed a propensity to commit murder that constitutes a continuing threat to society.

The district court below, and this Court on review, have considered all evidence submitted in mitigation, weighed that evidence against each of the two aggravating factors, and have concluded that the mitigating circumstances do not outweigh the gravity of either aggravating circumstance found.

C. THE AGGRAVATING CIRCUMSTANCES FOUND BY THE DISTRICT COURT ARE NOT UNCONSTITUTIONAL

Fields argues that the aggravating factor found under I.C. § 19–2515(g)(7) is unconstitutional because the finding that he possessed the specific intent to kill was made by the district court, rather than the jury. In support of this argument, Fields contends that the United States Supreme Court's holding in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), precludes imposition of the death penalty on a defendant who was not convicted by the jury of intentionally committing the murder.

Fields' reliance on *Enmund* is misplaced. Enmund did not kill the victim for whose death he was convicted and sentenced. Enmund was convicted of felony murder for a killing that occurred during a robbery, his participation in which was limited to driving

the "get-away car." *Enmund* does not stand for the proposition that a jury must determine that the defendant committed an intentional murder in order for the death penalty to satisfy the requirements of the Eighth and Fourteenth Amendments to the United States Constitution. Rather, under *Enmund,* the trier of fact must determine that the defendant actually killed, attempted to kill, or contemplated that a life would be taken. 458 U.S. at 797, 102 S.Ct. at 3376. Fields does not dispute the fact that the jury found that he actually killed his victim. *Enmund* is therefore inapposite to the issue presented in this case.

The United States Supreme Court recently rejected the argument that a defendant who is convicted of felony murder by a jury cannot be sentenced to death when the sentencing court makes the finding of intent. *Schiro v. Farley,* 510 U.S. 222, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994). The defendant in *Schiro* was charged in Indiana state court with both intentional and felony murder for a single killing. The jury returned a verdict finding Schiro guilty of felony murder. The jury left the portion of the verdict form dealing with intentional murder blank. *Id.* at ——, 114 S.Ct. at 787. For the death penalty to be imposed under Indiana law, the State was required to establish the existence of one or more aggravating factors beyond a reasonable doubt. The district court found, under Indiana Code § 35–50–2–9(b) (Supp.1978), that "the defendant committed the murder by intentionally killing the victim while committing or attempting to commit [an enumerated felony]." Schiro challenged the trial court's ability to make this finding, contending that the jury's silence on the intentional murder count collaterally estopped the State from relitigating the issue of intent. *Id.* at ——, 114 S.Ct. at 790. The United States Supreme Court rejected this argument, holding that:

> The failure to return a verdict does not have collateral estoppel effect, however, unless the record establishes that the issue was actually and necessarily decided in the defendant's favor. As explained above,

our cases require an examination of the entire record to determine whether the jury could have "grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration."

*Id.* at ——, 114 S.Ct. at 792 (citations omitted).

In this case, the jury was not instructed on or required to decide whether Fields intentionally killed his victim. This Court has repeatedly held that jury participation in the sentencing process is not required by either the United States Constitution or the Idaho Constitution. *E.g., State v. Pizzuto,* 119 Idaho 742, 769–70, 810 P.2d 680, 707–08 (1991), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 495 (1992), *overruled on other grounds, State v. Card,* 121 Idaho 425, 433, 825 P.2d 1081, 1089 (1991). The trial court's finding that the murder was committed during the commission of an enumerated felony and was accompanied with the specific intent to kill is clearly supported by facts in the record.

■ Fields also challenges I.C. § 19–2515(g)(8) on the grounds that this factor is facially unconstitutionally vague. Fields' vagueness challenge to I.C. § 19–2515(g)(8) has specifically been rejected by this Court. *E.g., Pizzuto,* 119 Idaho at 772, 810 P.2d at 710. Similarly the United States Supreme Court has acknowledged the validity of considering a defendant's future dangerousness in a capital sentencing scheme. *Tuilaepa v. California,* —— U.S. ——, ——, 114 S.Ct. 2630, 2637, 129 L.Ed.2d 750 (1994) ("Both a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process, however, and the States have considerable latitude in determining how to guide the sentencer's decision in this respect.").

## D. THE SENTENCE OF DEATH IS NOT EXCESSIVE

Fields argues that the imposition of the death penalty in this case is excessive to the extent that it is disproportionate to the penalty imposed in similar cases. In 1994, the Idaho Legislature amended the statute governing the standards to be applied by this Court when reviewing cases in which the death penalty is imposed. S.B. No. 1302, 1994 Idaho Sess.Laws, ch. 127. The legislature's amendment eliminated the requirement that this Court conduct a proportionality review. After this amendment, I.C. § 19–2827(c)(3) requires that this Court consider "[w]hether the sentence of death is excessive." Prior to this amendment, excessiveness was determined under that section by determining whether the penalty in the case before this Court was "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." I.C. § 19–2827(c)(3) (1977). The elimination of this language has rendered the term "excessive" as used in I.C. § 19–2827(c)(3) meaningless. We therefore decline to undertake any consideration of "excessiveness" beyond our independent review to determine whether the district court's finding and weighing of aggravating and mitigating factors is supported by the record.

### IX

### CONCLUSION

Fields' conviction on the charge of first-degree murder and sentence of death are affirmed.

TROUT, J., and WESTON, J. Pro Tem., concur.

JOHNSON, Justice, concurring and concurring in the result.

I concur in all of the Court's opinion, except parts II, III, VI, and VIII(B).

### II.

I concur in the result of part II (The Admission of Fields' Statements to Inmate Witnesses Did Not Violate Fields's Constitutional Rights). I agree with the Court's con-

clusion that Fields was not subjected to interrogation in violation of his right to counsel under the Sixth Amendment. In holding that the interrogation did not violate the Idaho Constitution, I respectfully point out that the Court does not make the necessary analysis of the scope of protection provided by art. 1, § 13 of our state constitution.

As the Court has recently reaffirmed: "It is by now beyond dispute that this Court is free to interpret our state constitution as more protective of the rights of Idaho citizens than the United States Supreme Court's interpretation of the federal constitution." *State v. Guzman,* 122 Idaho 981, 987, 842 P.2d 660, 666 (1992).

In my view, the Idaho Constitution should be the primary source of constitutional protection in Idaho. We should consider whether the U.S. Constitution affords protection only when the Idaho Constitution does not provide the protection that is sought. In carrying out its role as the interpreter of the Idaho Constitution, this Court should consider first the Idaho Constitution, when its provisions are invoked, without looking to the interpretation given to comparable provisions of the U.S. Constitution by the U.S. Supreme Court. The Court followed this principle in *Coeur d'Alene Garbage v. Coeur d'Alene,* 114 Idaho 588, 590, 759 P.2d 879, 881 (1988) in concluding that the protection of the just compensation clause of art. 1, § 14 of the Idaho Constitution was a sufficient basis for the decision, without addressing the just compensation clause of the Fifth Amendment.

Fields asserts that the admission of the inmate witnesses' testimony violated his rights "to appear and defend in person and with counsel," and not to be "compelled in any criminal case to be a witness against himself," which is guaranteed by article 1, § 13 of the Idaho Constitution. I note first that in *State v. Fain,* 116 Idaho 82, 85, 774 P.2d 252, 255 (1989), cited in the Court's opinion, the Court addressed only the protection afforded by the Sixth Amendment, and did not even mention art. 1, § 13 of the Idaho Constitution.

In a case with facts somewhat similar to those in the present case, this Court appeared to address the right to counsel protections of both the Sixth Amendment and art. 1, § 13 of the Idaho Constitution without differentiating the scope of the protection afforded by the two constitutions. *State v. LePage,* 102 Idaho 387, 392–93, 630 P.2d 674, 679–80 (1981). Although this would make it appear that the Court has adopted the scope of protection afforded by the right to counsel provision the Sixth Amendment as that afforded by the right to counsel provision of art. 1, § 13, the Court noted: "At oral argument, the state conceded that there had been a *Massiah* violation." *Id.* at 392 n. 4, 630 P.2d at 679 n. 4. Therefore, there was no occasion for the Court to evaluate any different protection afforded by the state constitution.

In *Mahler v. Birnbaum,* 95 Idaho 14, 501 P.2d 282 (1972), however, the Court ruled on the protections afforded by the right to counsel provisions of both art. 1, § 13, and the Sixth Amendment, without differentiating the scope of the state protection from that of the federal protection, based on a decision of the U.S. Supreme Court. *Id.* at 15, 501 P.2d at 283.

In *State v. Calkins,* 63 Idaho 314, 318–20, 120 P.2d 253, 254–55 (1941), the Court considered the right to counsel protection afforded by art. 1, § 13 of the Idaho Constitution, without addressing the scope of protection afforded by the Sixth Amendment.

Neither the proceedings of our constitutional convention nor the prior decisions of this Court provide a basis for construing the right to counsel provision of art. 1, § 13 as affording more protection than the Sixth Amendment. In addition, a textual analysis does not lead to a different result.

Art. 1, § 13 of the Idaho Constitution does not use the same words to guarantee the right to counsel that the Sixth Amendment does. Art. 1, § 13 guarantees the right of the party accused "to appear and defend in person and with counsel." The Sixth

Amendment guarantees the accused the right "to have the assistance of counsel for his defense." The wording of art. 1 § 13, does not indicate to me that the drafters of our state constitution intended to provide a larger guarantee of the right to counsel than that contained in the Sixth Amendment. If anything, the words seem to indicate a smaller scope of protection. The right "to appear and defend" seems directed more toward courtroom proceedings than to activities that may occur outside the courtroom. Therefore, I conclude that art. 1, § 13 does not afford more right to counsel protection than the Sixth Amendment.

Fields also asserts that the admission of the inmate witnesses' testimony violated his right not to be compelled to be a witness against himself protected by art. 1, § 13 of the Idaho Constitution. In *State v. Bock*, 80 Idaho 296, 328 P.2d 1065 (1958), the Court addressed this state constitutional protection:

> This court has long held that the acts and conduct, declarations, statements, and admissions of the accused, before, at the time of, or subsequent to arrest, when not the result of unconstitutional coercion, are admissible in evidence against [the accused].
>
> It has also long been the rule in this state that admissions of the accused whether made before or after arrest are admissible without a preliminary showing that they were voluntarily made.

*Id.* at 307, 328 P.2d at 1071–72 (citations omitted).

It is clear that the statements of Fields that were the subject of the inmate witnesses' testimony did not violate these standards.

### III.

I concur in the result of part III (The Eye–Witness Identifications of Fields Were Not Impermissibly Tainted by Media Publication of Fields's Photograph). The Court's analysis focusing on the merits of the issue is not the proper fundamental error analysis. The proper analysis is stated in *State v. Kenner*, 121 Idaho 594, 597, 826 P.2d 1306 (1992): "In order to determine whether we will consider an issue presented on appeal that was not presented to the trial court, we first must assess whether the error would be fundamental if there were error." Employing this analysis, the Court should first assume that it was error for the trial court to have allowed the eye-witness identifications before assessing whether the error would be fundamental. Employing this analysis, I conclude that an error in the admission of the eye-witness identifications tainted by media publication of Fields's photograph would be fundamental error.

This Court has recognized that there is a due process right not to have a tainted identification that would create a substantial likelihood of misidentification. *State v. Hoisington*, 104 Idaho 153, 161–62, 657 P.2d 17, 25–26 (1983). This type of error would take from Fields a right which was essential to his defense. Therefore, any error of this nature would be fundamental.

On the merits, however, I agree with the analysis of the Court that there is inadequate evidence to establish a tainting of the identifications.

### VI.

I concur in the result of part VI (The District Court Did Not Err by Denying Fields's Motion For a New Trial Based on Newly Discovered Evidence). In my view, the trial court should not have considered Martinez's testimony presented in an unrelated proceeding as a basis for rejecting his testimony in support of the motion for new trial. Nevertheless, the trial court's decision reveals that this was not the sole basis for the trial court's conclusion that Martinez was not a credible witness. In fact, the trial court had already declared that Martinez's testimony was "unbelievable to this Court or any reasonable jury" before mentioning Martinez's testimony in the other proceeding.

### VIII(B).

I concur in the result of part VIII(B) (The Evidence Supports the Finding of a Statuto-

ry Aggravating Circumstance). In my view, a review of evidence to support the trial court's finding of the I.C. § 19–2515(g)(7) aggravating circumstance is unnecessary, because there is substantial evidence to support the finding of the I.C. § 19–2515(g)(8) aggravating circumstance. A finding of one aggravating circumstance is sufficient to lead to the weighing specified in I.C. § 19–2515(c), which is a prerequisite to the imposition of the death penalty.

SILAK, J., concurring, and concurring in result part VIII. D.

I concur fully in the Court's opinion, except that I concur in the result in Part VIII(D). In my view the requirement found in the current version of I.C. § 19–2827(c)(3), to consider "whether the sentence of death is excessive," requires the same type of excessiveness analysis that the Court has performed in non-capital cases. *See, e.g., State v. Babb,* 125 Idaho 934, 940, 877 P.2d 905, 911 (1994); *State v. Broadhead,* 120 Idaho 141, 814 P.2d 401 (1991), *overruled on other grounds, State v. Brown,* 121 Idaho 385, 394, 825 P.2d 482, 491 (1992). Applying that analysis to the present case, I conclude that the sentence is not excessive.